SUTTON, J., delivered the opinion of the court in which BOGGS, BATCHELDER, GIBBONS, ROGERS, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, and STRANCH, JJ., *454 joined. WHITE, J. (pp. 470-71), delivered a separate opinion concurring in the judgment in which MOORE and GILMAN, JJ., joined. CLAY, J. (pp. 471-88), delivered a separate dissenting opinion. DONALD, J. (pg. 488), delivered a separate dissenting opinion in which COLE, C.J., joined.
OPINION
SUTTON, Circuit Judge.
After people commit violent crimes, they sometimes flee, leaving the city of the crime in some instances, even leaving the country in others. If a fugitive leaves the country, that complicates law enforcement efforts. One trait of sovereignty is that countries have no legal, as opposed to moral, obligation to turn criminal suspects over to another country for prosecution. The point of extradition treaties is to prevent such crimes from going unpunished by imposing a golden rule obligation on each party to the treaty — an agreement by each country to return haven-seeking fugitives to the other.
The golden rule is not the first thing that came to anyone’s mind after two murders occurred at a New Year’s Eve party gone awry in a small Mexican village in 2006. Avelino Cruz Martinez, now a citizen of the United States, attended the party and admits that there is probable cause to believe he was the assailant. After the murders, Cruz Martinez returned to his home in the United States.
Invoking a 1978 extradition treaty, Mexico asked its northern neighbor to return Cruz Martinez to Mexico to be tried for murder. Cruz Martinez filed a habeas corpus petition, claiming that his extradition would violate Article 7 of the treaty, which prohibits extradition when “prosecution” or “enforcement of the penalty” for the charged offense “has become barred by lapse of time according to the laws of the requesting or requested Party.” Extradition Treaty, U.S.-Mex., art. 7, May 4, 1978, 31 U.S.T. 5059, 5064-65. In particular, he argued that his extradition would violate (1) the relevant statute of limitations and (2) his Sixth Amendment right to a speedy trial. The district court rejected his arguments and denied his petition for habeas corpus. So do we.
I.
Santa María Natividad, a village in the State of Oaxaca, Mexico, is home to about fifty families and two hundred residents. One of those residents was Samuel Francisco Solano Cruz, who was to host a goat roast for municipal leaders and members of the town band on New Year’s Day 2006. In the waning hours of 2005, he went to a party outside the local municipal hall to deliver the invitations. But shortly after he arrived, a man approached him, screamed “son of a bitch!”, and shot him six times. R. 2-13 at 14 (emphasis omitted). A bystander, Antolin Cruz Reyes, who tried to help Solano Cruz was shot as well. Both men died from the gunshot wounds, while the murderer got in his truck and fled the scene.
Solano Cruz’s family accused Avelino Cruz Martinez, then a United States permanent resident (and a citizen since 2010) whose family lived in Santa María Nativi-dad, of the murders. Within two weeks of the shooting, Solano Cruz’s widow and parents met with Cruz Martinez’s wife and brother before a town clerk. Although Cruz Martinez’s wife maintains her husband’s innocence, she, along with the four others present at the meeting, signed an agreement stating that Cruz Martinez had “committed the homicide.” R. 2-17 at 12. It also provided that “the family of the perpetrator” would pay 50,000 pesos for “the expenses incurred” by Solano Cruz’s *455 relatives as a result of the “unfortunate incident.” Id. “Once the parties accept this agreement and commit to enact its terms,” the contract concluded, “the matter shall be closed.” Id. at 13.
The matter did not close. A few days after Solano Cruz’s family agreed to settle, two eyewitnesses made sworn statements before public officials, pointing to Cruz Martinez as the New Year’s Eve murderer. An Oaxacan judge issued an arrest warrant charging Cruz Martinez with “murder with the aggravating circumstance of unfair advantage,” R. 2-13 at 11 (emphasis omitted), which covers homicides that occur when the perpetrator “is superior in physical force” and the victim “is not armed,” or when the perpetrator “is superior by the weapons [he] use[s]” as compared to the victim, id. at 52. The court issued the warrant on February 23, 2006, and notified the public prosecutor’s office the next day.
That is how things stood for the next few years. Cruz Martinez, following the murders, returned to the United States, although he traveled back to Mexico a couple times. His family remained in Santa María Natividad for a time but eventually joined him in the United States — Lebanon, Tennessee, to be precise.
In 2009, an American consular official asked about the status of Cruz Martinez’s arrest warrant, and the Oaxacan court responded that it was “still pending and executable.” Id. at 59. In May 2012, the Mexican government filed a diplomatic note with the United States Department of State, informing it of the charges against Cruz Martinez and requesting his “provisional arrest” (a procedure authorized by the extradition treaty between the two nations). R. 2-6 at 16 (emphasis omitted); see Extradition Treaty, U.S.-Mex., supra, art. 11, 31 U.S.T. at 5068. American authorities arrested him a little over a year later, and Mexican officials filed a formal extradition request in August 2013.
That filing triggered a set of diplomatic, judicial, and quasi-judicial procedures. Federal law authorizes the United States Secretary of State to designate federal and state judges or magistrate judges to conduct hearings whenever a foreign nation requests an individual’s extradition under the terms of a treaty. 18 U.S.C. § 3184. If the judge “deems the evidence sufficient to sustain the charge,” the statute provides, “he shall certify ... to the Secretary of State” that the individual is extraditable. Id. The certification decision is not appealable, although the accused may challenge it through a petition for habeas corpus. In re Mackin, 668 F.2d 122, 125-30 (2d Cir. 1981); see In re Metzger, 46 U.S. 176, 191-92, 5 How. 176, 12 L.Ed. 104 (1847). Following certification, the Secretary of State decides, as a matter of discretion, whether to extradite the accused. 18 U.S.C. § 3186; see Nezirovic v. Holt, 779 F.3d 233, 237 (4th Cir. 2015).
Complying with these procedures, the Secretary of State filed Mexico’s extradition request with a federal magistrate judge in Tennessee. Cruz Martinez raised multiple challenges to his provisional arrest and to the extradition proceedings. But the magistrate judge rejected all of them, certifying to the Secretary of State that Cruz Martinez could be extradited. Cruz Martinez filed a habeas corpus action contesting the magistrate judge’s certification decision, see 28 U.S.C. § 2241(a), but the district court denied his petition. Cruz Martinez appealed.
II.
“Extradition shall not be granted,” Article 7 of the United States-Mexico Extradition Treaty says, “when the prosecution or the enforcement of the penalty” for the *456 charged offense “has become barred by lapse of time according to the laws of the requesting or requested Party.” Extradition Treaty, U.S.-Mex., supra, art. 7, 31 U.S.T. at 5064-65. Cruz Martinez argues that his prosecution has become barred by (1) the relevant American statute of limitations and (2) the Speedy Trial Clause of the Sixth Amendment to the United States Constitution. We consider each argument in turn.
A.
Cruz Martinez argues that the charged offense is analogous to second-degree murder under American federal law, which means a five-year limitations period applies to the charge. 18 U.S.C. §§ 1111(a)-(b), 3282(a). The government disagrees, comparing the offense to first-degree murder, which comes with no limitations period. Id. §§ llll(a)-(b), 3281, 3591(a)(2). We need not take sides on this dispute because, for the reasons forcefully expressed in the panel majority’s opinion, the statute of limitations did not expire even if the five-year period applies. Cruz Martinez v. United States, 793 F.3d 533, 542-44 (6th Cir. 2015).
“[N]o person shall be prosecuted, tried, or punished for any [non-capital] offense,” the five-year limitations statute provides, “unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.” 18 U.S.C. § 3282(a). Because statutes of limitations protect defendants from excessive delay between the time of the offense and the time of prosecution, they stop running when the prosecution begins — which means, in American federal courts, when an indictment or information is returned. United States v. Marion, 404 U.S. 307, 320-23, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). But Mexico, which models its legal system not on Blackstone’s common law but on Napoleon’s civil law, lacks the sort of indictment and information procedures that exist in the United States. Miguel Sarré & Jan Perlin, “Mexico,” in Criminal Procedure: A Worldwide Study 351, 372 (Craig M. Bradley ed., 2d ed. 2007). Does that mean there is nothing Mexico can do under § 3282 to prevent a “lapse of time” from occurring? No: Because the issuance of an arrest warrant marks the end of the preliminary investigation and the beginning of the prosecution in Mexico, that event stops the American statute of limitations from running. And because a Mexican court issued an arrest warrant within two months of Cruz Martinez’s alleged offense, the five-year limitations period does not bar his prosecution.
The only other circuit to consider this question agrees. It held that “a Mexican arrest warrant is the equivalent of a United States indictment and may toll the United States statute of limitations” for purposes of an extradition treaty. Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009). The Third Restatement of Foreign Relations Law echoes the point. “For purposes of applying statutes of limitation to requests for extradition,” it notes, courts generally calculate the limitations period “from the time of the alleged commission of the offense to the time of the warrant, arrest, indictment, or similar step in the requesting state, or of the filing of the request for extradition, whichever occurs first.” Restatement (Third) of the Foreign Relations Law of the United States § 476 cmt. e (1987).
Cruz Martinez concedes that Mexico should be able to satisfy § 3282 even though it does not have an indictment or information procedure. Cruz Martinez Principal Br. 34. But the American clock keeps ticking, he argues, until Mexico does something (such as “designate]” Cruz *457 Martinez “a fugitive from justice”) that would stop the limitations period from running under Mexican law. R. 2-19 at 2. An arrest warrant, he says, does not do the trick. The extradition treaty, however, offers a defense to extradition when prosecution is barred “according to the laws of the requesting or requested Party,” Extradition Treaty, U.S.-Mex., supra, art. 7, 31 U.S.T. at 5065 — a formulation that does not require us to mix and match national laws by applying Mexican legal requirements to American limitations periods. That language is especially significant given that some extradition treaties do demand this sort of jumbling, requiring the requested State to “take[] into consideration insofar as possible” any “acts constituting an interruption or a suspension of the time-bar in the Requesting State.” Extradition Treaty, U.S.-Belg., art. 2(6), Apr. 27, 1987, T.I.A.S. No. 97-901, at 2; see also Extradition Treaty, U.S.-Lux., art. 2(6), Oct. 1, 1996, T.I.A.S. No. 12,804, at 4. The American statute of limitations does not bar Cruz Martinez’s prosecution.
B.
1.
Cruz Martinez separately argues that the treaty’s “barred by lapse of time” provision picks up the Speedy Trial Clause of the Sixth Amendment to the United States Constitution, which says that, “[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.” At the outset, it is worth clarifying what he does, and does not, argue in this respect. He does not argue that the speedy-trial guarantee applies to an American (like Cruz Martinez) who is tried in a Mexican court for violating Mexican law. When the Sixth Amendment says “all criminal prosecutions,” it refers to all prosecutions in this country, not anywhere in the world. See United States v. Balsys, 524 U.S. 666, 672-75, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998). And he does not argue that the guarantee applies to extradition proceedings, which áre not “criminal prosecutions.” See Martin v. Warden, 993 F.2d 824, 829 (11th Cir. 1993). He instead argues that the treaty’s “barred by lapse of time” language incorporates the speedy-trial guarantee and prohibits extradition when a Mexican prosecution would violate that right. As he sees it, a non-speedy trial is one that takes too long to start and to finish, which creates a lapse-of-time defect in the prosecution. It is not that easy. The text and context of the treaty provision, the illuminating history behind it, and all precedential authority and scholarly commentary establish that the phrase “barred by lapse of time” does not incorporate the American Constitution’s speedy-trial guarantee.
Text. Article 7, recall, prohibits extradition “when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party.” Extradition Treaty, U.S.-Mex., supra, art. 7, 31 U.S.T. at 5064-65. Put less passively, time must do the barring. Yet the Sixth Amendment does not create a fixed time bar on trial initiation — a time limit after which the trial must be called off. As the Supreme Court has explained, the speedy-trial right is “consistent with delays” (and thus consistent with lapses of time) and “depends upon circumstances,” as it is “impossible to determine with precision when the right has been denied” in our system of “swift but deliberate” justice. Barker v. Wingo, 407 U.S. 514, 521-22, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (emphasis added) (quotation omitted). The right is a “relative,” “amorphous,” and “slippery” one. Id. at 522, 92 S.Ct. 2182 (quotation omitted). Because the Sixth *458 Amendment does not establish a time limit, fixed or otherwise, before a trial must start, it does not create a' rule that “bar[s]” criminal prosecutions due to “lapse of time.”
Not only does Cruz Martinez’s argument require us to add something to the Sixth Amendment that does not exist (a time bar), it requires us to subtract requirements of the Sixth Amendment that do exist. A criminal defendant cannot win a Sixth Amendment challenge by pointing to a calendar and counting off the days. He instead must show that, by balancing the four factors the Supreme Court has instructed us to consider in speedy-trial cases, he should receive relief. Id. at 530-38, 92 S.Ct. 2182. The “[l]ength of delay,” it is true, is one of those factors — but only one. Id. at 530, 92 S.Ct. 2182. Courts also must weigh “the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant” in determining whether a speedy-trial violation occurred. Id. Even if there has been considerable delay, for example, “a valid reason” for that delay, “such as a missing witness, should serve to justify” it. Id. at 531, 92 S.Ct. 2182. If a defendant fails to object contemporaneously to the lapse of time, the Supreme Court has told us, that will also “make it difficult for [him] to prove that he was denied a speedy trial.” Id. at 532, 92 S.Ct. 2182. “[N]one of the four factors” — not even delay of a specified length — is “a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.” Id. at 533, 92 S.Ct. 2182. The Court could not be clearer: Lapse of time, standing alone, does not— cannot — violate the Speedy Trial Clause in the absence of at least some of the other factors. We know of no case in which a lapse of time by itself created a speedy-trial violation — or, to put it in the words of the treaty, in which the prosecution was “barred by lapse of time.”
Another textual clue points in the same direction. The treaty does not cover any and all “lapse[s] of time” that may occur in a criminal case. It applies only to time lapses with respect to “the prosecution or the enforcement of the penalty” for the charged offense. Extradition Treaty, U.S.-Mex., supra, art. 7, 31 U.S.T. at 5064-65. That language naturally applies to statutes-of-limitations periods that “bar[ ]” the commencement of a “prosecution” or “enforcement” proceeding. It also naturally applies to limitations periods that “bar[ ]” “penalties]” already handed down from being “enforcefd]” to the extent any exist — limitations periods that, while generally unknown in the United States, are common in civil law countries like Mexico. See Yapp v. Reno, 26 F.3d 1562, 1568 (11th Cir. 1994). The same is not true for guarantees that apply after an indictment (or its equivalent) through the end of trial. Just as this treaty provision would not cover criminal procedure guarantees that apply to a trial already begun, it does not naturally apply to speedy-trial requirements that prohibit the criminal process, once started, from continuing. The speedy-trial right after all operates not by barring the initiation of a prosecution but by preventing it from continuing, see Marion, 404 U.S. at 320-23, 92 S.Ct. 455, and may not apply to the execution of sentences already pronounced, cf. United States v. Melody, 863 F.2d 499, 504-05 (7th Cir. 1988). These rights, like trial guarantees, usually kick in outside the two periods in which extradition limits apply: (1) the initiation of a prosecution and (2) the enforcement of a “judicially pronounced penalty of deprivation of liberty.” Extradition Treaty, U.S.-Mex., supra, art. 1(1), 31 U.S.T. at 5061.
*459 Another linguistic clue supports this interpretation. In this case, as in many cases involving treaty interpretation, we have not one official text but two — the English and Spanish versions of the treaty, each of which is “equally authentic.” Id., 31 U.S.T. at 5075. The English version of Article 7 bears the title “Lapse of Time,” while the Spanish version says “Prescrip-ción.” Compare id., art. 7, 31 U.S.T. at 5064, with id., art. 7, 31 U.S.T. at 5083. And the phrase “barred by lapse of time” reads, in the Spanish version of the text, “haya prescrito,” using a verb form related to the noun “prescripción.” Compare id., art. 7, 31 U.S.T. at 5065, with id., art. 7, 31 U.S.T. at 5083. We must interpret the translated documents in tandem, because, “[i]f the English and the Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail.” United States v. Percheman, 32 U.S. (7 Pet.) 51, 88, 8 L.Ed. 604 (1833). In unearthing the best translation of non-English terms, we may refer to foreign “cases,” “dictionaries,” “legislative provisions,” “treatises and scholarly writing,” and other “legal materials,” as the Supreme Court has done when assessing the “legal meaning” of foreign words. E. Airlines, Inc. v. Floyd, 499 U.S. 530, 536-40, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991); Air France v. Saks, 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).
The English and Spanish texts of the 1978 extradition treaty “conform!]” quite easily, it turns out, because “prescripción” means “statute of limitations.” Bilingual legal dictionaries tell us as much, with one Spanish-English dictionary providing “[s]tatute of limitations” as the first definition of “prescripción.” Henry Saint Dahl, Dahl’s Law Dictionary 385 (6th ed. 2015). Mexican legal provisions tell us as much, because Article 88 of the Code of Criminal Procedure of Oaxaca — the state where Cruz Martinez’s alleged crimes occurred— uses the phrase “[c]ómputo de la prescrip-ción” to describe the “[c]alculation of the [sjtatute of [ljimitations.” R. 2-19 at 2, 7. Previous treaties tell us as much, because the 1899 United States-Mexico extradition treaty translates the phrase “has become barred by limitation” (a phrase that, as Cruz Martinez concedes, refers only to statutes of limitations) as “la prescripción impida.” Treaty of Extradition, U.S.-Mex., art. 111(3), Feb. 22, 1899, 31 Stat. 1818, 1821. The Department of State tells us as much, because, in a 1959 letter to the Department of Justice, it used the phrases “prescription” and “statute of limitations” interchangeably. 6 Marjorie M. Whiteman, Digest of International Law § 17, at 864 (1968). And English legal dictionaries tell us as much, indicating that the word “prescription” means “[t]he effect of the lapse of time in creating and destroying rights” and that the phrase “liberative prescription” refers to “the civil-law equivalent of a statute of limitations.” Black’s Law Dictionary 1373 (10th ed. 2014) (emphasis added). When writing the words “lapse of time” in Spanish, the treaty’s drafters thus chose language that reflected the phrase’s status as a term of art within the law of extradition — a term of art interchangeable with the phrase “statute of limitations.”
Context. Article 7’s neighbors reinforce this conclusion. Article 10(2) of the treaty sets forth the extradition procedures that a requesting State must follow and requires every request to include “[t]he text of the legal provisions relating to the time limit on the prosecution or the execution of the punishment of the offense.” Extradition Treaty, U.S.-Mex., supra, art. 10(2)(d), 31 U.S.T. at 5066 (emphasis added). This disclosure requirement provides an enforcement mechanism for Article 7, allowing the requested State to verify whether extradition is “barred by lapse of time” without *460 embarking on a self-guided tour of another country’s laws. Article 10(2) in other words interprets “lapse of time” to mean “time limit,” confirming that the language covers only statutes of limitations. See Cruz Martinez Principal Br. 11 (equating “time limit” and “statute of limitations”).
History. A few pages of history confirm the logic of this interpretation. Extradition treaties have been a part of American international relations since 1794, when Jay’s Treaty provided that “his Majesty and the United States, on mutual requisitions, ... will deliver up to justice all persons, who, being charged with murder or forgery, committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other.” Treaty of Amity, Commerce and Navigation, U.S.Gr. Brit., art. XXVII, Nov. 19,1794, 8 Stat. 116, 129. Mexico entered the picture in 1861, when the United States signed an extradition treaty with its southern neighbor at the start of the Civil War. Treaty for the Extradition of Criminals, U.S.Mex., Dec. 11, 1861,' 12 Stat. 1199. The parties agreed to a new treaty in 1899, adding a provision that forbade extradition “[w]hen the legal proceedings or the enforcement of the penalty for the act committed by the person demanded has become barred by limitation according to the laws of the country to which the requisition is addressed.” Treaty of Extradition, U.S.-Mex., supra, art. 111(3), 31 Stat. at 1821 (emphasis added). The parties renegotiated yet again in the late 1970s, producing the treaty that still governs extraditions between the United States and Mexico. Extradition Treaty, U.S.-Mex., supra, 31 U.S.T. 5059. That treaty revised the “barred by limitation” provision into its current form, prohibiting extradition “when the prosecution or the enforcement of the penalty” for the charged offense “has become barred by lapse of time according to the laws of the requesting or requested Party.” Id., art. 7, 31 U.S.T. at 5064-65.
When the treaty drafters incorporated the phrase “lapse of time” into the United States-Mexico extradition agreement, they were not working on a blank slate. A “lapse of time” provision appeared as early as the United States’ 1877 extradition treaty with Spain, which prohibited extradition when “prosecution or punishment” for the charged offense was. barred by “lapse of time or other lawful cause.” Convention on Extradition, U.S.-Spain, art. V, Jan. 5, 1877,19 Stat. 650, 653; see also Convention for the Extradition of Criminals, U.S.-Neth., art. V, May 22, 1880, 21 Stat. 769, 772. From the start, that language bore a close relationship to statutes of limitations. An 1891 treatise, for example, described the Spanish treaty’s “lapse of time” provision as a rule of “prescription,” employing a synonym for “statute of limitations” in English and Spanish, and went on to use the phrases “lapse of time,” “barred by limitation,” and “statutes of limitation” interchangeably in the course of a single paragraph. I John Bassett Moore, A Treatise on Extradition and Interstate Rendition § 373, at 569-70 (1891); see Black’s Law Dictionary, supra, at 1321, 1373 (defining “period of prescription,” “prescription,” and “liberative prescription”); Henry Saint Dahl, Dahl’s Law Dictionary, supra, at 385.
The practice of using these terms as synonyms within the law of extradition continues today. Take our treaty with South Korea, which, in a section titled “Lapse of Time,” permits the parties to deny extradition “when the prosecution or the execution of punishment” for the charged offense “would have been barred because of the statute of limitations of the Requested State.” Extradition Treaty, U.S.-S. Kor., art. 6, June 9, 1998, T.I.A.S. No. 12,962, at 4; see Extradition Treaty, *461 U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866, at 5 (stating, in an article titled “Lapse of Time,” that “[ejxtradition shall not be denied on the ground that the prosecution or the penalty would be barred under the statute of limitations in the Requested State”); see also Extradition Treaty, U.S.-Costa Rica, art. 7, Dec. 16, 1982, S. Treaty Doc. No. 98-17, at 3 (1984) (stating, in an article titled “Statute of Limitations,” that “[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty ... has become barred by lapse of time”); Extradition Treaty, U.S.-Colom., art. 6, Sept. 14, 1979, S. Treaty Doc. No. 97-8, at 3 (1981) (same). Or take our treaty with France, which forbids extradition if prosecution is “barred by lapse of time” in the requested State but qualifies that prohibition by requiring the requested State to account for certain “[a]ets in the Requesting State that would interrupt or suspend the prescriptive period” Extradition Treaty, U.S.-Fr., art. 9, Apr. 23,1996, T.I.A.S. No. 02-201, at 8 (emphasis added); see Extradition Treaty, U.S.-Bulg., art. 6, Sept. 19, 2007, S. Treaty Doc. No. 110-12, at 9 (2008) (using similar language); Extradition Treaty, U.S.-Rom., art. 6, Sept. 10, 2007, S. Treaty Doc. No. 110-11, at 7 (2008) (similar); Extradition Treaty, U.S.-Lux., supra, art. 2(6), T.I.A.S. No. 12,804, at 4 (similar); see also Black’s Law Dictionary, supra, at 1321 (defining “period of prescription”).
Or take our six treaties with six of the countries in the Organization of Eastern Caribbean States. In sections headed “Lapse of Time,” they all say that “[extradition shall not be denied because of the prescriptive laws of either the Requesting State or the Requested State.” Extradition Treaties with Organization of Eastern Caribbean States, S. Treaty Doc. No. 105-19, at 11, 33, 55, 77, 98, 120 (1997); see Extradition Treaty, U.S.-Belize, art. 8, Mar. 30, 2000, T.I.A.S. No. 13,089, at 5 (using the same language); Extradition Treaty, U.S.Barb., art. 8, Feb. 28, 1996, S. Treaty Doc. No. 105-20, at 10 (1997) (same); see also Extradition Treaty, U.S.Cyprus, art. 7, June 17, 1996, S. Treaty Doc. No. 105-16, at 7 (1997) (using similar language); Extradition Treaty, U.S.-Trin. & Tobago, art. 6, Mar. 4, 1996, S. Treaty Doc. No. 105-21, at 8 (1997) (similar). When transmitting these treaties to the Senate for its advice and consent, the President described the six identical lapse-of-time provisions as “enabling] extradition requests to be granted irrespective of statutes of limitations” in any State. Extradition Treaties with Organization of Eastern Caribbean States, supra, S. Treaty Doc. No. 105-19, at vii; see also Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 529-32, 535 n. 19, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (referencing transmittal materials and Senate documents in the course of interpreting a treaty). Cruz Martinez offers no contrary drafting or signatory history with respect to these six treaties or the others mentioned above in which anyone thought that the phrase “lapse of time” incorporated the Sixth Amendment’s speedy-trial guarantee.
The phrase “lapse of time” also holds a similar meaning in American law, where it has been used in the context of state laws applying out-of-state statutes of limitations to out-of-state causes of action. Consider the Minnesota borrowing statute upheld by the Supreme Court in Canadian Northern Railway Co. v. Eggen, 252 U.S. 553, 40 S.Ct. 402, 64 L.Ed. 713 (1920). The statute provided that, “[w]hen a cause of action has arisen outside of this state, and, by the laws of the place where it arose, an action thereon is there barred by lapse of time, no such action shall be maintained in this state unless the plaintiff be a citizen of the state who has owned the cause of action *462 ever since it accrued.” Id. at 558, 40 S.Ct. 402 (emphasis added) (quotation omitted). The Court characterized this statute, phrased in “precisely the same” terms “as those of several other states,” as granting a “nonresident the same rights in the Minnesota courts as a resident citizen has, for a time equal to that of the statute of limitations' where his cause of action arose.” Id. at 560, 40 S.Ct. 402 (emphasis added).
Viewed against this backdrop — against over a century of law equating “lapse of time” with statutes of limitations — Article 7 of the United States-Mexico Extradition Treaty comes into focus. The article’s “lapse of time” language does not incorporate the Sixth Amendment’s speedy-trial protections.
Precedent. Every case on the books has concluded that this phrase encompasses only statutes of limitations. The Eleventh Circuit faced Cruz Martinez’s precise argument and rejected it. Here is what the court said: “Weighing heavily against [the accused’s] position is the fact that for over a century, the term ‘lapse of time’ has been commonly associated with a statute of limitations violation. ... Thus, we hold that the ‘lapse of time’ provision in Article 5 of the [United States-Bahamas] Extradition Treaty refers to the running of a statute of limitations and not to a defendant’s Sixth Amendment right to a speedy trial.” Yapp, 26 F.3d at 1567-68. A district court has reached the same conclusion. Gonzalez v. O’Keefe, No. C 12-2681 LHK (PR), 2014 WL 6065880, at *2-4 (N.D. Cal. Nov. 12, 2014). So too have several magistrate judges. In re Extradition of Flores Ortiz, No. 10-MJ-2016-JMA, 2011 WL 3441618, at *5-6 (S.D. Cal. Feb. 9, 2011); In re Extradition of Salazar, No. 09MJ2545-BLM, 2010 WL 2925444, at *6-7 (S.D. Cal. July 23, 2010); United States v. Garfias, No. CR-09-xr-90128 EMC, 2009 WL 2580641, at *2-3 (N.D. Cal. Aug. 20, 2009).
Also illustrative of the argument’s novelty are the many cases where accused individuals challenged their extradition under treaties with a “lapse of time” provision but failed to even raise a speedy-trial claim, despite long delays in the proceedings. Skaftouros v. United States, 667 F.3d 144, 161-62 (2d Cir. 2011) (Greece); Sainez, 588 F.3d at 715-17 (Mexico); Ross v. U.S. Marshal, 168 F.3d 1190, 1193-95 (10th Cir. 1999) (United Kingdom); In re Extradition of Ramos Herrera, 268 F.Supp.2d 688, 697-99 (W.D. Tex. 2003) (Mexico); In re Extradition of Suarez-Mason, 694 F.Supp. 676, 686-87 (N.D. Cal. 1988) (Argentina); In re Extradition of Liuksila, 74 F.Supp.3d 4, 12-15 (D.D.C. 2014)- (Finland); United States v. Gonzalez, No. CV 13-1867 R (FFM), 2014 WL 1383972, at *7-10 (C.D. Cal. Apr. 9, 2014) (Mexico); In re Extradition of Johnson, No. 12-65M, 2012 WL 4973938, at *8-10 (W-D. Pa. Oct. 17, 2012) (Mexico). Not one of the extraditees in these cases thought the speedy-trial point was worth their time — and thus did not argue that the phrase “lapse of time” incorporated the Sixth Amendment right. If imitation is the sincerest form of flattery, its opposite must be the most credible form of disagreement. In another case, the accused did raise a speedy-trial claim, but — even though the treaty in question contained a “lapse of time” provision — he grounded his claim in a different clause, one giving fugitives “the right to use such remedies and recourses as are provided by the law of the requested Party.” In re Extradition of Kraiselburd, 786 F.2d 1395, 1397-99 (9th Cir. 1986) (quotation omitted). That’s not just the case of the dog who didn’t bark. See Chisom v. Roemer, 501 U.S. 380, 396 n. 23, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). It’s the case of the dog who, even *463 when he did bark, chose to bark up a different tree.
Commentary. So far as our research and the research of the parties have revealed, all scholars see it the same way. The Third Restatement of Foreign Relations Law notes that, “[u]nder most international agreements, state laws, and state practice,” an individual “will not be extradited ... if the applicable period of limitation has expired.” Restatement, supra, § 476. The commentary to that provision notes that some treaties prohibit extradition if prosecution “has become barred by lapse of time,” “if either state’s statute of limitations has run,” or if there is a “time-bar.” Id. § 476 cmt. e. Eliminating any doubt, the section concludes by noting that, “[i]f the treaty contains no reference to the effect of a lapse of time, neither state’s statute of limitations will be applied.” Id. The only way to make sense of the Restatements discussion is to recognize that each of these terms — “period of limitation,” “lapse of time,” “time-bar,” “statute of limitations” — means the same thing.
The model treaty promulgated by the United Nations to help countries create new extradition regimes points in the same direction. A supplement to that document gives States a variety of options for dealing with a “lapse of time,” noting that they may “wish ... to provide that acts of interruption in the requesting State should be recognized in the requested State.” G.A. Res. 52/88, Annex, art. 8(2), U.N. Doc. A/RES/52/88 (Dec. 12, 1997); see also G.A. Res. 45/116, Annex, art. 3(e), U.N. Doc. A/RES/45/116 (Dec. 14, 1990). This flexibility, the accompanying best-practices manual explains, stems from the reality that “domestic legal frameworks governing lapse of time often vary widely, with various formulae for calculating the expiration of the statutory period.” U.N. Office on Drugs & Crime, Revised Manuals on the Model Treaty on Extradition and on the Model Treaty on Mutual Assistance in Criminal Matters 19 (2006), http://www. unodc.org/pdf/modeLtreaty_extradition_ revised_manual.pdf (emphasis added).
Default rule. All of these interpretive indicators reveal that the phrase “lapse of time” excludes speedy-trial protections. But even if there were ambiguity about the point, that would not change things. For ambiguity in an extradition treaty must be construed in favor of the “rights” the “parties” may claim under it. Factor v. Laubenheimer, 290 U.S. 276, 293-94, 54 S.Ct. 191, 78 L.Ed. 315 (1933). The parties to the treaty are countries, and the right the treaty creates is the right of one country to demand the extradition of fugitives in the other country— “to facilitate extradition between the parties to the treaty.” M. Cherif Bassiouni, International Extradition: United States Law and Practice 142 (6th ed. 2014). As the First Circuit explained, Factor requires courts to “interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories.” In re Extradition of Howard, 996 F.2d 1320, 1330-31 (1st Cir. 1993); see also Nezirovic, 779 F.3d at 239; Ludecke v. U.S. Marshal, 15 F.3d 496, 498 (5th Cir. 1994); United States v. Wiebe, 733 F.2d 549, 554 (8th Cir. 1984). The point of an extradition treaty after all is to facilitate extradition, as any country surely would agree at the time of signing. See, e.g., Ludecke, 15 F.3d at 498. In the face of one reading of “lapse of time” that excludes the speedy-trial right and another reading that embraces it, Factor says we must prefer the former.
This default rule accords with comity considerations that lurk beneath the surface of all extradition cases. Courts must take care to avoid “supervising the integrity of the judicial system of another *464 sovereign nation” because doing so “would directly conflict with the principle of comity upon which extradition is based.” Jhirad v. Ferrandina, 536 F.2d 478, 484-85 (2d Cir. 1976). Respect for the sovereignty of other countries explains why an American citizen who “commits a crime in a foreign country ... cannot complain if required to submit to such modes of trial ... as the laws of that country may prescribe for its own people.” Neely v. Henkel, 180 U.S. 109, 123, 21 S.Ct. 302, 45 L.Ed. 448 (1901). And it explains why “[w]e are bound by the existence of an extradition treaty to assume that the trial [that occurs after extradition is granted] will be fair.” Glucksman v. Henkel, 221 U.S. 508, 512, 31 S.Ct. 704, 55 L.Ed. 830 (1911). These constraints reflect the reality that “political actors,” not judicial ones, are best equipped to make the “sensitive foreign policy judgments” an extradition request demands. Hoxha v. Levi, 465 F.3d 554, 563 (3d Cir. 2006). The habeas power does not come with the authority to interfere with proceedings “inevitably entangled in the conduct of our international relations” unless the treaty demands it. Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Just last' year, the Supreme Court reminded Congress to tread carefully before entangling itself in American foreign policies customarily overseen by the Executive Branch. Zivotofsky ex rel. Zivotofsky v. Kerry, — U.S.-, 135 S.Ct. 2076, 2094-96, 192 L.Ed.2d 83 (2015).
Interpreting this treaty in a way that suddenly sweeps speedy-trial rights into its coverage does not honor these objectives and would affirmatively disserve them. Because the constitutional speedy-trial right has no fixed time limit, in contrast to statutes of limitations, what ex-traditee will not raise the claim in all of its indeterminate glory? The mutability of the right makes it impossible to know how much delay is too much delay.-Take the alleged delay in Cruz Martinez’s case: around six years. Although a delay of one year or more is presumptively prejudicial, six years may not be enough to state a speedy-trial claim in view of other considerations, our court has said, when the government is not to blame for the delay and the defendant does not identify any evidence of prejudice. See United States v. Bass, 460 F.3d 830, 838 (6th Cir. 2006). But it very well could be enough to state a claim, another court has said, when the government is to blame and does not “overcome the presumption of general prejudice that applies with considerable force in a case of such extraordinary delay.” See United States v. Velazquez, 749 F.3d 161, 174, 186 (3d Cir. 2014). What of the question of fault? Whether the State or a defendant is more to blame for untoward delays is “[t]he flag all litigants seek to capture” in a speedy-trial case. United States v. Loud Hawk, 474 U.S. 302, 315, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). Before we task the courts of both countries with refereeing these elusive and deeply sensitive inquiries, we should be sure the negotiating countries wanted them as umpires.
In. the final analysis, Cruz Martinez’s argument comes up short. No matter where we look — to the text of this treaty (in English and Spanish), to the text of other treaties, to historical principles underlying those treaties, to judicial decisions interpreting those treaties, to commentaries explaining those treaties, to guidance explaining how to draft those treaties, to the Factor default rule — all roads lead to the same conclusion. The United States and Mexico did not impose a speedy-trial limit when they forbade the extradition of fugitives whose “prosecution” was “barred by lapse of time.”
*465 2.
In arguing that “lapse of time” means something else, Cruz Martinez notes that this is not the first extradition treaty between the United States and Mexico. The present version, he points out, replaced the phrase “barred by limitation” from the previous treaty with the phrase “barred by lapse of time.” Compare Treaty of Extradition, U.S.-Mex., supra, art. 111(3), 31 Stat. at 1821, with Extradition Treaty, U.S.Mex., supra, art. 7, 31 U.S.T. at 5064-65. In the process, he submits, it expanded the scope of the provision to cover speedy-trial rights.
But this argument assumes that the new phrase captures more ground than the old phrase with respect to the issue at hand. It does not. The word “time” appears nowhere in the phrase “barred by limitation.” But the context of the treaty and all authority interpreting it show that the phrase refers only to time limitations' — -not anything and everything that might “limit[ ]” a criminal prosecution, such as all of the criminal procedure protections that appear in the Bill of Rights and all of the state and federal laws that protect criminal suspects. That the old phrase impliedly included a time limitation eliminates the significance of the new phrase’s reference to “time” no matter how the phrase is glossed: “time bar,” “time limitation,” “lapse óf time,” “lapse in time,” “passage of time,” and so on. Cruz Martinez recognizes as much when he concedes that the phrase “barred by limitation” restricted the old treaty’s “time-bar provision to the operation of statutes of limitation.” Cruz Martinez Principal Br. 48 (emphasis added). If the old treaty contained a “time-bar provision,” there is nothing about the new language that adds to the provision’s breadth — and thus nothing that gives Cruz Martinez traction in claiming that it suddenly extends to speedy-trial rights.
The treaty’s drafting history confirms as much. Its transmittal materials do not mention the Sixth Amendment once, an omission that takes on special significance in light of the Senate Committee on Foreign Relations’ decision to include a list of differences between the new treaty and “previously ratified” ones. S. Exec. Rep. No. 96-21, at 19 (1979). The speedy-trial right appears nowhere on that list.
One court at one point, it is true, agreed with Cruz Martinez’s reading of the phrase “lapse of time.” The district court in In re Extradition of Mylonas ruled that “lapse of time or other lawful cause” in the United States-Greece extradition treaty applied to speedy-trial violations. 187 F.Supp. 716, 721 (N.D. Ala. 1960). But this was hardly a landmark extradition decision. The opinion contained no analysis of the issue, just a half-sentence conclusion. Id. And when it came time to assess whether an explanation for the Mylonas court’s conclusion could be found, the Eleventh Circuit came up dry, and “expressly disapprove^]” the district court’s ruling. Martin, 993 F.2d at 829 n. 8. The Eleventh Circuit disapproved of Mylonas again the next year, stating that it did “not find [the opinion] persuasive.” Yapp, 26 F.3d at 1567. We need not resurrect this twice-buried decision by concluding that the extradition treaty drafters incorporated it into the phrase “lapse of time,” contradicting over a century of jurisprudence in the process.
Nor does it matter that Mylonas was still on the books when the United States and Mexico negotiated their revised extradition treaty, because this treaty does not use the same language as the treaty discussed in Mylonas. That one said “lapse of time or other lawful cause,” 187 F.Supp. at 721 (emphasis added); this one says “lapse of time” alone. It would be odd to conclude that the treaty’s drafters meant to adopt this trial court’s decision (if indeed they *466 had ever heard of it) but then used different — and narrower — language.
Other agreements drafted during the same period as the United States-Mexico treaty confirm that Mylonas was not on anyone’s radar. At least seven extradition treaties drafted between 1960 (when Mylo-nas was handed down) and 1993 (when the Eleventh Circuit disapproved it) include provisions similar to Article 7 of the United States-Mexico treaty. Treaty Relating to Extradition, U.S.-Thai., art. 7, Dec. 14, 1983, S. Treaty Doc. No. 98-16, at 3; Extradition Treaty, U.S.-It., art. VIII, Oct. 13, 1983, 35 U.S.T. 3023, 3030; Extradition Treaty, U.S.-Costa Rica, supra, art. 7, S. Treaty Doc. No. 98-17, at 3; Treaty on Extradition and Mutual Assistance in Criminal Matters, U.S.-Turk., art. 3(c), June 7, 1979, 32 U.S.T. 3111, 3116-17; Treaty on Extradition, U.S.-Para., art. 5(3), May 24, 1973, 25 U.S.T. 967, 973; Treaty on Extradition and Cooperation in Penal Matters, U.S.-Uru., art. 5(3), Apr. 6, 1973, 35 U.S.T. 3197, 3207; Treaty on Extradition, U.S.-N.Z., art. VI(3), Jan. 12, 1970, 22 U.S.T. 1, 4. The Senate Executive Reports accompanying each of these documents indicated that “lapse of time” referred to statutes of limitations. S. Exec. Rep. No. 98-29, at 5 (1984) (Thailand); S. Exec. Rep. No. 98-33, at 4-5 (1984) (Italy); S. Exec. Rep. No. 98-30, at 6 (1984) (Costa Rica); S. Exec. Rep. No. 96-18, at 6 (1979) (Turkey); S. Exec. Rep. No. 93-19, at 3 (1973) (Paraguay, Uruguay); S. Exec. Rep. No. 91-20, at 3-4 (1970) (New Zealand). A 1968 State Department digest on international law points in the same direction, noting that “[o]ne of the most common exemptions from extradition relates to offenses for which prosecution or punishment is barred by lapse of time, usually referred to as barring by ‘lapse of time’, prescription, or statute of limitation.” 6 Whiteman, Digest of International Law, supra, § 17, at 859. We have not found, and Cruz Martinez has not produced, evidence suggesting that anyone meant to deviate so drastically from a consensus so settled.
But, Cruz Martinez persists, doesn’t Doggett v. United States indicate that time alone may do the barring in some speedy-trial cases — which means the phrase “lapse of time” necessarily incorporates, as a textual matter, constitutional speedy-trial protections? 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Cruz Martinez points in particular to Doggett’s statement that, “[w]hen the Government’s negligence ... causes [a six-year delay], and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant’s acquiescence, nor persuasively rebutted, the defendant is entitled to relief.” Id. at 658, 112 S.Ct. 2686. Far from validating Cruz Martinez’s inference, however, that sentence supports the opposite one. Even though a lengthy lapse of time occurred, Doggett was “entitled to relief’ only because he pointed to several other factors, including “the Government’s negligence” and his failure to “acquiesce[ ]” in the postponed proceedings. Id. That holding comports with the Court’s statement in Barker that none of the four factors analyzed in speedy-trial cases, not even the passage of time, has “talismanic qualities” and that courts must always “engage in a difficult and sensitive balancing process.” 407 U.S. at 533, 92 S.Ct. 2182.
Nor does Doggett tell us anything about the role of the Speedy Trial Clause when the United States extradites an American citizen to a foreign nation. Doggett, it is true, establishes that individuals who are extradited to the United States from a foreign country receive speedy-trial protections in American courts, just like any litigant who faces “domestic criminal proceedings.” Balsys, 524 U.S. at 672, 118 S.Ct. 2218. But that observation breaks no *467 new ground: Individuals tried in American courts receive American protections, including all of the criminal procedure guarantees of the Bill of Rights, just as individuals tried in Mexican courts (as Cruz Martinez might be) receive Mexican protections. Doggett merely explains how the Speedy Trial Clause affects extraditees after their return to the United States, but it sheds no light on the meaning of “lapse of time” as applied to the threshold decision whether to extradite an individual under the terms of a treaty.
The dissent raises two concerns about our translation of the word “prescripción” from the official Spanish language version of the treaty: that the parties did not raise the point in their appellate briefs and that we are not experts in Spanish. Both are fair points, but they submit to fair answers. During oral argument, one of our colleagues (Judge Rogers) asked the parties about the meaning of the Spanish term and about his understanding that the term is associated with statutes of limitations in civil law countries. The parties responded to his point at argument and filed letters in response after the argument. Use of dictionaries by courts, even dictionary definitions not cited by the parties, is not an unusual phenomenon. As for the second concern, the dissent is correct that we do not speak Spanish fluently. But that explains why we have consulted Spanish-English dictionaries and English-Spanish dictionaries, just as the Supreme Court has done in interpreting other treaties. Floyd, 499 U.S. at 536-37, 111 S.Ct. 1489; Saks, 470 U.S. at 399-400, 105 S.Ct. 1338.
The context of this interpretive dispute — language in an extradition treaty— dispenses with another of Cruz Martinez’s rejoinders: that, in other circumstances, the lapse-of-time shorthand can refer not just to statutes of limitations but also to other doctrines rooted in the passage of time. Take a comment in the Third Restatement equating “[ljapse of time” with a “delay in presentation” due to “negligence or laches.” Restatement, supra, § 902 cmt. c (emphasis omitted). Section 902, however, concerns not extradition but country-versus-country disputes where one State violates an obligation owed to another. The section thus does not prove that the phrase “lapse of time” incorporates an individual speedy-trial right in this setting, especially when the one pertinent comment from the Restatement indicates that, for extradition purposes, the term “lapse of time” extends to limitations periods only. Id. § 476 cmt. e.
“Lapse of time,” it is true, might well have a broader meaning in isolation. It might mean all kinds of things in other settings. Witness Hamlet’s plaintive request to his father’s ghost: “Do you not come your tardy son to chide, [tjhat, lapsed in time and passion, lets go by [t]he important acting of your dread command?” William Shakespeare, Hamlet act 3, sc. 4. The question, however, is what words mean in their context, not in the abstract or in other settings. To think otherwise about the matter calls to mind the spelunker who leaves home with an excellent map and a broken headlamp. One is of no use without the other. So too of text without context. Not a single extant source of authority in this context — the language of an international extradition treaty — equates “barred by lapse of time” with “barred by the Sixth Amendment.”
By shearing the phrase “lapse of time” from its context, moreover, Cruz Martinez introduces a serious complication. If “lapse of time” covers the constitutional speedy-trial guarantee, there is no reason to think it would not cover the statutory one. The Speedy Trial Act says that “the trial of a defendant charged ... *468 with the commission of an offense shall commence within seventy days” of the indictment, information, or the defendant’s appearance before the court, whichever occurs later. 18 U.S.C. § 3161(c)(1). When the Act’s provisions are violated, the court has discretion (after considering several statutorily defined factors) to dismiss the case with or without prejudice. Id. § 3162(a)(2); United States v. Taylor, 487 U.S. 326, 332-37, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988). These provisions would leave foreign nations with just seventy days to issue any extradition request after the Act’s clock starts ticking if they want to avoid debates about whether any delay was excusable. See 18 U.S.C. § 3161(h). What will happen next is the kudzu-like spreading of Speedy Trial Act claims and the choking out of statute-of-limitations claims — and thus the choking out of the one claim that all agree is covered by the phrase “barred by lapse of time.” In case after case, extradition requests that violate no statute of limitations will be denied for Speedy Trial Act violations.
Think about Cruz Martinez’s situation. The American and Mexican statutes of limitations have not run, but because more than seventy days have passed since Mexico issued an arrest warrant for Cruz Martinez, the Speedy Trial Act would (if applied) likely prevent his extradition. The same is true of other cases. Consider United States v. Garfias, where the United States’ statute of limitations did not bar Garfias’s extradition, but the Speedy Trial Act would likely have done so due to the nearly eight-year delay between Mexico’s arrest warrant and its extradition request. 2009 WL 2580641, at *1, *3-5. And the list goes on. E.g., Sainez, 588 F.3d at 715-17 (no statute of limitations violation in a case where there was a seven-year gap between the issuance of a Mexican arrest warrant and the extradition request); In re Flores Ortiz, 2011 WL 3441618, at *1, *6-7 (no statute of limitations violation in a case where there was a nearly three-year delay between the issuance of a Mexican arrest warrant and the extradition request); In re Salazar, 2010 WL 2925444, at *4-5 (no statute of limitations violation in a case where there was a nearly ten-year delay between the issuance of a Mexican arrest warrant and the extradition request). Were Cruz Martinez’s argument to succeed, it is difficult to imagine a lapse-of-time case where the most fruitful line of attack would not be the statutory, or for that matter the constitutional, speedy-trial claim.
Cruz Martinez concludes by noting that, because the phrase “barred by lapse of time” could be read broadly, it must be read broadly. He quotes the Supreme Court’s admonition in Factor that treaty “obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them.” 290 U.S. at 293, 54 S.Ct. 191. And he tells us to look at each section of the extradition treaty individually, classifying every provision as either an extradition-authorizing or extradition-limiting one. After we have done so, he adds, we should expansively interpret the authorizing provisions in favor of the nation that seeks extradition, and we should expansively interpret the limiting provisions in favor of the fugitive. Because the “lapse of time” provision places limits on extradition and accords rights to the accused, Cruz Martinez insists, a “liberal[ ]” interpretation requires us to infer that this language incorporates speedy-trial protections. Id.
But a distinction between authorizing and limiting provisions does not exist in extradition law and would not work in any event. The provision at issue in Factor, for example, listed the specific crimes for which an individual could be extradited— *469 but is that provision better conceived as authorizing extradition for the specified crimes or as limiting extradition to those crimes? Id. at 287-90 & nn. 1-2, 54 S.Ct. 191. Even if we assume that the provision authorizes extradition, what do we do when there are two provisions at issue? In Factor itself, the Court asked whether the section listing extraditable offenses was limited by a provision stating that individuals could be extradited “only ... upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed.” Id. at 287 n. 1, 290-91, 54 S.Ct. 191 (quotation omitted). If Cruz Martinez’s reading were correct, the Court in Factor would have found itself at a standstill — required to interpret the authorizing provision in favor of extradition but the limiting provision in favor of the fugitive. That’s not very useful. This granular, section-by-section approach not only fails to explain Factor, it fails to provide courts with any administrable rule at all.
No such rule exists, as the cases cited by Cruz Martinez demonstrate. In some of those cases, the Supreme Court simply assessed treaty language using conventional interpretive techniques without resorting to the Factor canon (and even, in one case, rejecting that canon’s applicability). Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 10-18, 57 S.Ct. 100, 81 L.Ed. 5 (1936); Pettit v. Walshe, 194 U.S. 205, 217-20, 24 S.Ct. 657, 48 L.Ed. 938 (1904); United States v. Rauscher, 119 U.S. 407, 419-30, 7 S.Ct. 234, 30 L.Ed. 425 (1886). In others, the Court interpreted “[fjriendship, [cjommerce and [navigation treaties,” not extradition treaties, between the United States and another country— treaties that “were primarily concerned with the trade and shipping rights of individuals.” Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 186-87, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). The Court, no surprise, interpreted ambiguous individual-rights-creating provisions in those treaties, as opposed to extradition treaties, with an eye toward maximizing individuals’ rights. Nielsen v. Johnson, 279 U.S. 47, 51-52, 57-58, 49 S.Ct. 223, 73 L.Ed. 607 (1929); Jordan v. Tashiro, 278 U.S. 123, 127-30, 49 S.Ct. 47, 73 L.Ed. 214 (1928); Asakura v. City of Seattle, 265 U.S. 332, 342-44, 44 S.Ct. 515, 68 L.Ed. 1041 (1924); Geofroy v. Riggs, 133 U.S. 258, 271-73, 10 S.Ct. 295, 33 L.Ed. 642 (1890). The same reasoning does not apply to an extradition treaty designed to create a right that would not exist in the treaty’s absence: the right of a State to demand the “surrender of a fugitive” living in another State. Factor, 290 U.S. at 298, 54 S.Ct. 191.
That leaves what may be Cruz Martinez’s ultimate worry: that rejecting his interpretation of the treaty would allow Mexico to seek extradition of an American citizen years after a valid Mexican arrest warrant has issued. Just such a prospect exists here, he says, given his claim that he never tried to hide his address from American or Mexican authorities. But it is not this court’s “province” to limit the treaty’s scope in search of a seemingly “desirable result.” Cf. EEOC v. Abercrombie & Fitch Stores, Inc., — U.S.-, 135 S.Ct. 2028, 2033, 192 L.Ed.2d 35 (2015). Otherwise, the treaty would mean one thing for some fact patterns and something else for other fact patterns. Treaty interpretation, as opposed to executive branch discretion, does not turn on shifting fact patterns. Cruz Martinez’s arguments on this score are most productively (and, we would add, quite fairly) directed to the Secretary of State, who retains “sole discretion to determine whether or not [an individual] should actually be extradited.” United States v. Kin-Hong, 110 F.3d 103, *470 109 (1st Cir. 1997); see 18 U.S.C. § 3186; Restatement, supra, § 478 cmt. d. That discretion would prevent any untoward extradition from going forward, potentially including this one — which is why Cruz Martinez’s requests for relief are better directed to our diplomats than to our judges.
III.
Cruz Martinez raises two final challenges. He argues that the magistrate judge abused his discretion by denying discovery of documents related to 2009 communications between American officials and the Oaxacan court. So far as the record shows, however, the magistrate judge did not deny anything. He ordered the United States to produce “any exculpatory materials in its possession that would undercut a finding that there is probable cause” that Cruz Martinez committed the double murder. R. 2-7 at 1. The government confirmed that it had inquired with the relevant entities, that it did “not have any exculpatory evidence,” and that all pertinent evidence had “been provided to the [e]ourt.” R. 2-9 at 4. Cruz Martinez received all the discovery he was entitled to in an extradition proceeding. In re Extradition of Drayer, 190 F.3d 410, 415 (6th Cir. 1999).
Cruz Martinez next claims that his provisional arrest was illegal because the extradition treaty permits this sort of arrest only “[i]n the case of urgency.” Extradition Treaty, U.S.-Mex., supra, art. 11(1), 31 U.S.T. at 5068. Relatedly, he says he was denied procedural due process because the magistrate judge never held a hearing to address the “urgency” issue within the sixty-day period during which he was provisionally detained. But Cruz Martinez’s provisional arrest ended when Mexico submitted its formal extradition request, which means, as the panel majority correctly concluded, that his challenges to that arrest are moot. Nor is there any risk that he will “again be subjected to the alleged illegality” of an unjustified provisional detention. City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). If the United States hands him over to Mexico, his troubles here will be over (though his troubles there will be starting). And if the Secretary of State elects not to honor the extradition request, Mexico will be able to seek Cruz Martinez’s extradition a second time without requesting a provisional arrest; it can trigger the United States’ statutory detention authority simply by resubmitting its already prepared formal extradition request. 18 U.S.C. § 3184. Absent any realistic risk of future provisional arrests, we have no authority to hear Cruz Martinez’s challenges to this one.
TV.
For these reasons, we affirm.
CONCURRENCE IN THE JUDGMENT