**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ARTHUR JOHN PATTERSON,
*Petitioner-Appellant*,

v.

BARBARA WAGNER, Warden,
*Respondent-Appellee*.

No. 13-56080

D.C. No.
2:12-cv-09960-ODW

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted
November 21, 2014—Pasadena, California

Filed May 4, 2015

Before: William A. Fletcher and Jay S. Bybee, Circuit
Judges, and David A. Ezra, District Judge.[*]

Opinion by Judge W. Fletcher

---

[*] The Honorable David A. Ezra, District Judge for the U.S. District
Court for the Western District of Texas, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's dismissal of Arthur Patterson's habeas corpus petition challenging a magistrate judge's order certifying him for extradition to South Korea for prosecution for murder.

Patterson argued that his extradition would violate the 1998 extradition treaty between the United States and South Korea because his prosecution would be barred by the statute of limitations in the United States, and thus would violate the treaty's lapse-of-time provision. The panel held that the treaty's lapse-of-time provision, which states that extradition "may be denied" when the prosecution would have been barred by the statute of limitations in the United States, does not impose a mandatory bar to extradition.

Patterson also argued that his extradition would violate the double-jeopardy provision of the Status of Forces Agreement (SOFA) governing American military personnel, and their dependents, in South Korea. The panel disagreed with the premise that rights conferred by the SOFA may be enforced by the judiciary to block extradition.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Craig Anthony Harbaugh (argued), Isaacs/Friedberg, LLP, Los Angeles, California, for Petitioner-Appellant.

Nancy Spiegel (argued), Assistant United States Attorney, Los Angeles, California, for Respondent-Appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

As a teenager, Arthur Patterson was convicted in a South Korean court of destroying evidence in connection with a murder. After serving his prison term, Patterson left Korea for the United States. The South Korean government now seeks to prosecute him for the murder itself and requests that the United States extradite him. Over Patterson's objections, a magistrate judge certified him for extradition. Patterson filed a petition for a writ of habeas corpus to challenge the certification order. The district court denied Patterson's petition.

Patterson argues that his extradition would violate (1) the extradition treaty between the United States and South Korea and (2) the Status of Forces Agreement governing American military personnel and their dependents in South Korea. We conclude that neither the treaty nor the agreement bars extradition. We therefore affirm.

## I. Background

In 1997, Arthur Patterson, a seventeen-year-old son of an American serviceman stationed in South Korea, was involved in some manner in the murder of a Korean college student, Cho Joong-pil, in a Burger King restroom in Seoul. Patterson and his friend Edward Lee followed Cho into the restroom and came out covered in blood. Afterwards, each accused the other of having stabbed Cho. Almost twenty years later, South Korea seeks to prosecute Patterson for murder. Its extradition request alleges that Cho was stabbed with Patterson's knife, that Patterson threw the knife in a sewer after the stabbing, and that two of Patterson's friends have stated that Patterson told them that he killed Cho.

In the immediate aftermath of the murder, South Korean authorities accepted Patterson's claim that Lee, not Patterson, was the murderer. They prosecuted Lee for murder and Patterson for destruction of evidence. Patterson was convicted of destruction of evidence and served slightly more than a year in prison. In 1999, after his release from prison, Patterson left South Korea for the United States. Lee was convicted of murder, but his conviction was overturned on appeal. The South Korean government prosecuted Lee again, and he was acquitted.

In 2009, South Korean prosecutors obtained a warrant for Patterson's arrest and sent an extradition request to the United States government. In 2011, the U.S. government sought and obtained an arrest warrant and arrested Patterson. The government then filed a complaint in federal district court seeking Patterson's extradition to South Korea. Patterson opposed extradition. He argued that because the murder occurred in 1997, and because he had already been tried and

convicted of a crime related to the murder, two international agreements bar extradition for the prosecution South Korea now seeks to bring.

A magistrate judge rejected Patterson's arguments and certified him for extradition. Patterson then filed a petition for a writ of habeas corpus. The district court denied the petition, and Patterson timely appealed.

## II. Discussion

## A. Extradition

A state party to an extradition treaty ordinarily must comply with a request of another state party to arrest and deliver a person sought by that state for criminal prosecution. *See* Restatement (Third) of the Foreign Relations Law of the United States § 478 (1987 & 2014 Supp.). Extradition rests on the premise that "[a]ll nations have a common interest in the repression of crime." 1 John Bassett Moore, *A Treatise on Extradition and Interstate Rendition* § 3 (1891).

"[E]xtradition is a diplomatic process carried out through the powers of the executive, not the judicial, branch." *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1207 (9th Cir. 2003). Under the federal extradition statute, 18 U.S.C. § 3184, the country seeking extradition must first file a request with the State Department. *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006). "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney, if so instructed, files a complaint in federal district court seeking an arrest

warrant for the person sought to be extradited." *Blaxland*, 323 F.3d at 1207.

After the United States has sought an arrest warrant for the person to be extradited (known as the "relator"), a federal or state judicial officer must hold a hearing to determine whether to certify the relator for extradition. 18 U.S.C. § 3184. The role of the judge is "very limited." *Vo*, 447 F.3d at 1237. The judge must determine whether there is "'evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' or, in other words, whether there is probable cause." *Id.* (quoting 18 U.S.C. § 3184) (citation omitted). If the judge determines that there is probable cause, he or she "is required to certify the individual as extraditable to the Secretary of State." *Blaxland*, 323 F.3d at 1208. The Secretary then decides, in the exercise of his or her discretion, whether to extradite the relator to the requesting country. *Vo*, 447 F.3d at 1237.

"The authority of a . . . judge serving as an extradition judicial officer is . . . limited to determining an individual's eligibility to be extradited . . . ." *Id.* As part of the determination of eligibility for extradition, "the district or magistrate judge must . . . assess whether any of the applicable treaty provisions bar extradition of the alien for any of the charged offenses." *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000). Because an extradition certification is not a final order subject to appellate review, judicial review of the decision of the extradition judge is by habeas corpus. *Prasoprat v. Benov*, 421 F.3d 1009, 1013 (9th Cir. 2005). Our review of the district court's interpretation of the relevant international agreements is de novo. *Kamrin v. United States*, 725 F.2d 1225, 1227 (9th Cir. 1984).

### B. Potential Bars to Extradition

Patterson argues that two agreements between the United States and South Korea bar his extradition. First, he argues that his extradition would violate the extradition treaty between the two countries because his prosecution for murder would be barred by the statute of limitations in the United States, and thus would violate the treaty's lapse-of-time provision. Second, he argues that his extradition would violate the double-jeopardy provision of the Status of Forces Agreement governing American military personnel, and their dependents, in South Korea. We address each argument in turn.

### 1. Extradition Treaty

Patterson first argues that the 1998 extradition treaty between the United States and South Korea prohibits his extradition because his prosecution would be untimely. The question is whether the treaty's lapse-of-time provision, which states that extradition "may be denied" when the prosecution would have been barred by the relevant statute of limitations in the United States, imposes a mandatory bar to extradition. We conclude that it does not impose a mandatory bar.

Article 6 of the extradition treaty between the United States and South Korea provides, in part:

**Lapse of Time**

Extradition *may be denied* under this Treaty when the prosecution or the execution of punishment of the offense for which

> extradition is requested would have been
> barred because of the statute of limitations of
> the Requested State had the same offense
> been committed in the Requested State.

Extradition Treaty, U.S.-S. Kor., art. VI, June 9, 1998,
T.I.A.S. No. 12,962 ("Treaty") (emphasis added).  That is, if
a person cannot be prosecuted for a crime in the United States
because the relevant statute of limitations has expired,
extradition to South Korea for that crime "may be denied."
*Id.*

The parties agree that Patterson has been certified for
extradition for a crime for which he cannot now be
prosecuted in the United States.  The magistrate judge
certified Patterson for extradition only for second-degree
murder, concluding that the evidence did not support a
finding of probable cause for premeditated murder. The
magistrate judge then applied the five-year federal statute of
limitations for second-degree murder, *see* 18 U.S.C. §
3282(a), for the purpose of addressing the lapse-of-time
provision of Article 6.  The government challenges neither
the finding of probable cause nor the application of the
federal statute of limitations.  However, the government
contends that the lapse-of-time provision of Article 6 is not
judicially enforceable.

We begin with the text of the treaty.  *Medellin v. Texas*,
552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like
the interpretation of a statute, begins with its text.").  Article
6 provides, "Extradition *may be denied*."  Treaty, art. VI
(emphasis added).   The normal reading of "may" is
permissive, not mandatory.  The most natural reading of
Article 6, therefore, is that untimeliness is a discretionary

factor for the Secretary of State to consider in deciding whether to grant extradition. That is, the Secretary "may" decline to extradite someone whose prosecution would be time-barred in the United States, but he or she is not required to do so. Under this reading, there is no mandatory duty that a court may enforce. *Cf. Trinidad y Garcia v. Thomas*, 683 F.3d 952, 960 (9th Cir. 2012) (en banc) (Thomas, J., concurring) ("[I]t is the Secretary's role, not the courts', to determine whether extradition should be denied on humanitarian grounds . . . ." (internal quotation marks omitted)).

This reading of Article 6 is consistent with our decision in *Vo*. In that case, Vo was arrested in the United States for bombing the Vietnamese embassy in Thailand. 447 F.3d at 1238–39. When Thailand sought to extradite him, Vo argued that the relevant treaty barred his extradition. The treaty stated that extradition "*may be denied* when the person sought is being or has been proceeded against" (*i.e.*, prosecuted) in the extraditing country for a related crime. *Id.* at 1238 (emphasis added). We rejected Vo's argument that the "may-be-denied" language barred the judge from certifying his extradition, holding that the language meant that a proceeding for a related crime was a discretionary factor to be considered by the Secretary of State in deciding whether to extradite. *Id.* at 1246. We wrote that, as a general matter,

> [t]he two types of exception [*i.e.*, mandatory and discretionary] are characterized by different language in extradition treaties. The use of "shall" language in a treaty indicates a provision constitutes a mandatory exception. . . . The use of "may" language in

a treaty indicates a provision constitutes a discretionary exception.

*Id.* at 1246 n.13.

Patterson contends that our reading of "may be denied" in *Vo* does not apply to that same language in Article 6. Patterson argues that evidence from the treaty's drafting and negotiating history demonstrate that, despite the use of the "may-be-denied" language, Article 6 was intended to be a mandatory bar to untimely extradition requests. Patterson further argues that the magistrate judge erred by ignoring this evidence. We agree with Patterson that extra-textual evidence is relevant to treaty interpretation, but we disagree with him on the significance of that evidence in this case.

While "[t]he interpretation of a treaty . . . begins with its text," *Medellin*, 552 U.S. at 506, it does not end there. Because the purpose of treaty interpretation is to "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties," *Air France v. Saks*, 470 U.S. 392, 399 (1985), courts — including our Supreme Court — look to the executive branch's interpretation of the issue, the views of other contracting states, and the treaty's negotiation and drafting history in order to ensure that their interpretation of the text is not contradicted by other evidence of intent. *See Abbott v. Abbott*, 560 U.S. 1, 15–20 (2010) (examining these factors following its textual analysis); *Medellin*, 552 U.S. at 508–13 (same); *see also Vo*, 447 F.3d at 1246 n.13 (consulting a letter of submittal from the Secretary of State).

In this case, the extra-textual evidence, considered as a whole, reinforces the interpretation of Article 6 for which the

government argues. Patterson points to evidence that he contends shows that both the Senate and the executive branch understood Article 6 to impose a mandatory bar. But this evidence falls short of establishing that either the Senate or the executive branch understood the treaty in this way.

First, Patterson argues that the Senate Report accompanying the treaty shows that the Senate understood Article 6 to be mandatory. He points to the Report's summary, which states, "The Treaty with the Republic of Korea precludes extradition of offenses barred by an applicable statute of limitations." S. Exec. Rep. No. 106-13, at 5 (1999) ("Report"). Patterson argues that this language shows that the lapse-of-time provision of Article 6 is mandatory, not permissive. But the body of the Report calls that reading into question. The more detailed technical analysis of the treaty, contained in the body of the Report, describes Article 6 in permissive terms, stating that extradition "may be denied" and explaining that the Korean and U.S. statutes of limitations operate so differently that "this provision could be very difficult to implement." *Id.* at 14. The technical analysis points to three extradition treaties that have what it characterizes as "similar provisions." *Id.* Tellingly, two of those treaties use the word "shall," and one uses the word "may." *Compare* Extradition Treaty, U.S.-Fr., art. 9(1), Apr. 23, 1996, S. Treaty Doc. No. 105-13 ("shall"), *and* Extradition Treaty, U.S.-Japan, art. IV(3), Mar. 3, 1978, 31 U.S.T. 892 ("shall"), *with* Extradition Treaty, U.S.-Lux., art. 2(6), Oct. 1, 1996, S. Treaty Doc. No. 105-10 ("may"). When parties to a treaty intend to make an exception to extradition mandatory, in other words, they know how to state that it "shall" apply.

Second, Patterson argues that the hearings on the treaty show that the Senate understood Article 6 to be mandatory. He points to an exchange between Senator Rod Grams and John Harris, the Acting Director of the Office of International Affairs at the Department of Justice, during the Senate hearing.  But to the extent the exchange supports either reading of Article 6, it only weakly supports Patterson's contention that the Senate understood the provision to be mandatory, and it shows fairly clearly that the executive branch understood it to be permissive.  The exchange is as follows:

> SENATOR GRAMS:
>
>> *Article 6 of the proposed treaty bars extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out.*
>>
>> . . .
>>
>> So the question is are you confident that this article of the treaty adequately insures that fugitives cannot simply run out the clock by fleeing to Korea?
>
> MR. HARRIS:
>
>> *Senator, this article of the treaty was the subject of considerable negotiation.  As you may recall, of the treaties that were before the Senate last fall, most of them had slightly different language.*  Many of

our most modern extradition treaties flatly state that the statute of limitations of the requesting State will apply.

We have a few in which it was not possible to reach that resolution. In this case, because of the specific provisions of Korean law, we did agree that the statute of limitations of the requested State would apply. *But, as you have indicated, the specific language in the article is crafted so that those factors which toll the statute of limitations under the law of the requesting State would be given weight.*

Report at 37 (emphasis added).

The import of the italicized portion of Senator Grams's question is not clear. Senator Grams may have thought that Article 6 was a mandatory bar, as indicated in the italicized words, but he may have been speaking imprecisely. But even if Senator Grams was speaking precisely, he may have considered himself to have been informed to the contrary, and persuaded and corrected, by Mr. Harris's answer. And even if he was speaking precisely, and even if he did not change his view after hearing Mr. Harris's answer, Senator Grams was not speaking for the full Senate. By contrast, the import of Mr. Harris's words, given on behalf of the executive branch, is fairly clear. He stated that Article 6 was the subject of "considerable negotiation," and that the "specific language in the article is crafted" to give "weight" to a statute of limitations determination. *Id.*

Additional evidence of the executive branch's interpretation of Article 6 shows that the executive branch has interpreted Article 6 to grant discretion to the government to which the extradition request is made. The State Department's official submittal letter, which accompanied the treaty when President Clinton submitted it to the Senate, described the treaty provisions. *See* S. Treaty Doc. No. 106-2, at v (1999). In that letter, Deputy Secretary of State Strobe Talbott explained that "Article 6 *permits* extradition to be denied" when the prosecution would be untimely. *Id.* at vii (emphasis added). The submittal letter's use of the word "permits" rather than "requires" indicates that the executive branch believed that Article 6 was permissive rather than mandatory.

Taken as a whole, the extra-textual evidence reinforces the natural reading of Article 6. Under that reading, the Secretary of State may choose, in his or her discretion, whether to grant or deny extradition in a case where the statute of limitations in the United States has expired. Federal courts thus have no authority under Article 6 to dictate to the Secretary of State what he or she must do in such a case.

### 2. Status of Forces Agreement

Patterson next argues that the Status of Forces Agreement ("SOFA") governing American military personnel and their dependents in South Korea prohibits his extradition. Specifically, he argues that his extradition to Korea would expose him to double jeopardy in contravention of the SOFA, and that the SOFA confers a judicially enforceable right not to be extradited. The premise of Patterson's argument is that

rights conferred by the SOFA may be enforced by the judiciary to block extradition. We disagree with this premise.

The United States and South Korea entered into the SOFA in 1966 pursuant to the mutual defense treaty between the two countries. Under the agreement, U.S. military personnel and their dependents in Korea are entitled to enumerated rights, including, as relevant here, the right "not [to] be prosecuted or punished more than once for the same offense." Facilities and Areas and the Status of United States Armed Forces in Korea, U.S.-S. Kor., July 9, 1966, 17 U.S.T. 1677, 1780 ("SOFA"). The parties agree that the SOFA applies to Patterson, as he was the dependent of an American serviceman stationed in South Korea at the time of the murder.

Patterson argues that his prosecution in South Korea for murder would violate the SOFA provision protecting against double jeopardy. He argues that his conviction for destruction of evidence required a finding by the South Korean court in that proceeding that he did not commit the murder for which extradition is now sought. This is so, he argues, because the statute under which he was convicted prohibits the destruction of evidence in connection with "a criminal . . . case *against another*." Criminal Act, Act No. 293, Sept. 18, 1953, art. 155(1), *amended by* Act No. 5057, Dec. 29, 1995 (S. Kor.) (emphasis added). Thus, Patterson argues, the South Korean court was required to find in his earlier criminal trial that he was not the person who murdered Cho.

We need not reach the question whether the SOFA forbids Patterson's prosecution for murder in South Korea. A threshold question is whether, even if the double jeopardy

provision of SOFA forbids the prosecution, we can enforce that provision by blocking his extradition. We conclude that the answer to this question is "no."

For purposes of our decision, we assume that there is no categorical prohibition against a federal statute, or a treaty or other international agreement to which the United States is a party, providing a basis for a judicial order blocking extradition. *Cf. Trinidad y Garcia*, 683 F.3d at 956–57. But it is clear that the SOFA is not such an international agreement. We agree with the Seventh and D.C. Circuits that a relator seeking to block extradition by relying on an international agreement must show, at a minimum, that the agreement upon which he relies establishes a judicially enforceable right. *See In re Burt*, 737 F.2d 1477, 1487–88 (7th Cir. 1984); *Holmes v. Laird*, 459 F.2d 1211, 1222 (D.C. Cir. 1972); *cf. Edye v. Robertson* (*Head Money Cases*), 112 U.S. 580, 598 (1884) (a treaty, though primarily "a compact between independent nations," may contain "provisions which confer certain rights upon the citizens or subjects of one of the nations . . . which are capable of enforcement as between private parties in the courts of the country").

Though the SOFA appears to establish individual rights, we conclude that they are not judicially enforceable. Confronted with a similar question regarding the NATO status of forces agreement, the Seventh and D.C. Circuits looked to whether the agreement established judicial or diplomatic mechanisms for adjudicating disputes. *Burt*, 737 F.2d at 1487–88; *Holmes*, 459 F.2d at 1222. In *Burt*, the Seventh Circuit held that recourse for a violation was "diplomatic, not judicial," and on that basis rejected the relator's petition for a writ of habeas corpus. 737 F.2d at

1488. Similarly, in *Holmes*, the D.C. Circuit held that because the agreement required the parties to negotiate disputes "relating to the interpretation or application of this Agreement," the "enforcement mechanism" for the assertion of individual rights under the agreement was "diplomatic recourse only." 459 F.2d at 1222.

Here, as in *Burt* and *Holmes*, the U.S.-Korea SOFA establishes diplomatic procedures for resolution of matters arising under its provisions. It provides that "[a] Joint Committee shall be established as the means for consultation between [the United States and South Korea] on all matters requiring mutual consultation regarding the implementation of this Agreement except where otherwise provided." SOFA at 1704. Amendments adopted in 2001 specify a procedure by which the Joint Committee's jurisdiction is invoked: the state parties have ten days to resolve any complaint at the local level; the matter is then referred the Joint Committee, which has 21 days to resolve it; if the Committee cannot do so, the matter is referred to the two governments. Facilities and Areas and the Status of United States Armed Forces, U.S.-S. Kor., art. XXII, ¶¶ 5(c), 9, Jan. 18, 2001, T.I.A.S. No. 13,138. Like the NATO agreement, the SOFA establishes an enforcement mechanism that is "diplomatic, not judicial." *Burt*, 737 F.2d at 1488.

The SOFA's provisions thus establish a diplomatic conflict resolution scheme with no role for the judiciary. Even if prosecution of Patterson for murder violates the SOFA's provision protecting against double jeopardy (a question we do not decide), that provision does not provide a basis for a court to bar his extradition.

Conclusion

Because neither the treaty nor the SOFA provides a basis for a court to bar Patterson's extradition, the magistrate judge did not err in certifying him for extradition to South Korea, and the district court did not err in denying his petition for a writ of habeas corpus. Our decision does not foreclose Patterson from seeking relief from the Secretary of State. We hold only that neither the treaty nor the SOFA provides a basis for judicial relief.

**AFFIRMED.**