*Yoo v. United States*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2021

Argued: April 5, 2022     Decided: August 1, 2022

Docket No. 21-2755

HYUK KEE YOO, also known as Keith Yoo,

*Petitioner-Appellant,*

— v. —

UNITED STATES OF AMERICA,

*Respondent-Appellee,*

B e f o r e:

CALABRESI, LYNCH, and LOHIER, *Circuit Judges.*

Hyuk Kee Yoo appeals from a judgment of the United States District Court for the Southern District of New York (Seibel, *J.*) denying his petition for writ of habeas corpus in connection with an extradition proceeding. Yoo argues that the text of the relevant extradition treaty and its legislative history indicate that whether extradition is time-barred is a question for the extradition court, which

cannot issue a certificate of extraditability if extradition is so barred. We conclude that the most natural reading of the relevant extradition treaty's text is that the issue of timeliness is a matter for the relevant executive authority to decide in its discretion, not a question for the extradition court to decide as a matter of law. We hold that the district court did not err in rejecting Yoo's argument and denying his petition for a writ of habeas corpus and therefore **AFFIRM** the judgment of the district court.

---

PAUL SHECHTMAN, Bracewell LLP, New York, NY (Rebecca Foxwell, Bracewell LLP, New York, NY; Shawn P. Naunton, Zuckerman Spaeder LLP, New York, NY, *on the brief*), *for Petitioner-Appellant.*

DEREK WIKSTROM, Assistant United States Attorney (Won S. Shin, Assistant United States Attorney, *on the brief*), for Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Respondent-Appellee.*

---

GERARD E. LYNCH, *Circuit Judge*:

Hyuk Kee Yoo, also known as "Keith Yoo," appeals from a November 1, 2021 judgment of the United States District Court for the Southern District of New York (Cathy Seibel, *J.*), denying his petition for a writ of habeas corpus. A magistrate judge (Judith C. McCarthy, *M.J.*) certified Yoo as extraditable to South Korea pursuant to an extradition treaty between that country and the United States. Yoo filed the habeas petition in the district court in an attempt to avoid

2

extradition from the United States to South Korea to face seven charges of embezzlement related to his role in his family's business empire.

Both the magistrate judge and the district court held that whether the treaty's "Lapse of Time" provision bars extradition is a question for the Secretary of State to consider in deciding whether to extradite an individual, and not a mandatory determination for the extradition court to make in the first instance. Yoo argues that the district court erred in interpreting the treaty, and that the text of the treaty and its legislative history indicate that the federal courts must decide whether the statute of limitations bars extradition before issuing a certificate of extraditability. Yoo proceeds to argue that the statute of limitations has already lapsed and that his extradition should be barred on that ground.

Because the text of the treaty, on its most natural reading, makes clear that the issue of timeliness is a matter of discretion for the relevant executive authority of the country considering the extradition request, and not a mandatory bar that the courts must apply, we hold that the district court did not err in denying Yoo's petition for a writ of habeas corpus. We therefore AFFIRM the judgment of the district court.

## BACKGROUND

Yoo is a South Korean-born businessman who, before these extradition proceedings began, lived with his family in Pound Ridge, New York. His father, Byeong-eun Yoo, was a prominent businessman in South Korea as well as the founder and former leader of a South Korean church known as the Evangelical Baptist Church of Korea. The Yoo family allegedly controls a holding company that has significant stakes in several large South Korean companies. Yoo himself is alleged to have been involved in his family's businesses and to have served as the de facto leader of his father's church since 2010.

On May 8, 2014, a judge of the Incheon District Court in South Korea issued a warrant for Yoo's arrest. South Korean prosecutors charged Yoo with seven counts of embezzlement in violation of Korean criminal law committed within South Korea's jurisdiction.

Shortly thereafter, starting in May 2014, the South Korean government sent several requests in the form of diplomatic notes to the United States government seeking the extradition of Yoo to South Korea, pursuant to an extradition treaty in place between that country and the United States (the "Treaty") and the federal extradition statute, 18 U.S.C. § 3184. On February 27, 2020, the United

4

States Attorney for the Southern District of New York filed a sealed complaint in the district court before a magistrate judge, seeking a warrant for Yoo's arrest and a certification that Yoo was extraditable under the Treaty pursuant to § 3184. On July 22, 2020, the magistrate judge issued an arrest warrant, and Yoo was subsequently arrested and detained without bail.

Drawing on South Korea's extradition requests, the government's complaint alleged that between January 2008 and March 2014, Yoo "leveraged his family's power as business and religious leaders in Korea to pilfer the assets of various companies," by "conspir[ing] with the chief executive officers of the [v]ictim [c]ompanies to enter into sham contracts that served as vehicles through which [Yoo] embezzled millions of dollars." J.A. at 6.[1] Yoo's alleged embezzlements were committed in three principal ways: first, by causing the victim companies to make payments to him based on fraudulent trademark licensing agreements; second, by causing the victim companies to make payments to him based on fraudulent agreements for business consulting services; and third, by causing the victim companies to fund an exhibition of his

---

[1] The parties have filed a Joint Appendix in this appeal. Yoo has also filed a Special Appendix. We cite to the Joint Appendix as "J.A." and the Special Appendix as "S.A." throughout this opinion.

father's photography and "making disguised payments that were structured as advance payments for the purchase of the photographs at inflated values." *Id.* The South Korean government alleges that Yoo defrauded the victim companies of the equivalent of approximately $23 million.

On March 3, 2021, the magistrate judge held an extradition hearing. After finding that Yoo was extraditable, the magistrate judge issued a Certification of Extraditability and Order of Commitment (the "Certificate") on July 2, 2021. *In re Extradition of Hyuk Kee Yoo*, No. 20-MJ-2252, 2021 WL 2784836, at *1 (S.D.N.Y. July 2, 2021). Yoo, who had opposed his extradition and moved to dismiss the complaint, argued that the allegations of criminal conduct were not supported by probable cause and that his extradition was barred by the applicable statute of limitations in the United States under the terms of the Treaty. *Id.* The magistrate judge found that the "extradition request demonstrat[ed] probable cause and satisfie[d] the relevant requirements," and that, under the terms of the Treaty, the court "lack[ed] authority to determine whether this prosecution is time-barred, as that inquiry is a discretionary matter reserved for the Secretary of State." *Id.*

On July 21, 2021, Yoo petitioned the district court for a writ of habeas corpus under 28 U.S.C. § 2241, challenging the magistrate judge's determination

6

as to his extraditability and the issuance of the Certificate. As before the magistrate judge, Yoo argued that he could not be extradited to South Korea because the embezzlement charges he faces there are time-barred and not supported by probable cause.

On November 1, 2021, the district court denied Yoo's petition. *Yoo v. United States*, No. 21-cv-6184, 2021 WL 5054726 (S.D.N.Y. Nov. 1, 2021). Agreeing with the magistrate judge, the district court interpreted the Treaty's relevant provisions to commit the determination of whether the South Korean charges are time-barred to the Secretary of State's discretion. *Id.* at *9. The district court noted that the executive branch is the "final decision-maker and retains discretion to deny extradition," meaning that "discretionary determinations" under the Treaty are consigned to the authority of the Secretary of State while "mandatory determinations" are to be made by the extraditing court. *Id.* at *4 (quotation marks omitted). The district court found that, based on the text of the Treaty, any analysis of whether a charge faced by an extraditee was beyond the relevant statute of limitations was "a discretionary task assigned to the executive branch," and the district court therefore did not address the merits of Yoo's time-bar claim. *Id.* at *9. The district court proceeded to consider and reject Yoo's probable cause

7

challenge. *Id.* at *9-17. Accordingly, the district court denied Yoo's petition. *Id.* at *17.

Yoo timely appealed the district court's denial of his habeas corpus petition. On appeal, Yoo has abandoned the probable cause argument and challenges only the district court's ruling as to the statute of limitations.

## DISCUSSION

### I.    Standard of Review

"Our review of the denial of a petition for habeas corpus in extradition proceedings is 'narrow' in scope." *Sacirbey v. Guccione*, 589 F.3d 52, 62 (2d Cir. 2009), quoting *Murphy v. United States*, 199 F.3d 599, 601 (2d Cir. 1999). "A reviewing court can consider only three issues: '(1) whether the judge below had jurisdiction; (2) whether the offense charged is extraditable under the relevant treaty; and (3) whether the evidence presented by the Government established probable cause to extradite.'" *Id.* at 63, quoting *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000).

While we may not "second guess the determination of the magistrate judge to issue an order certifying a request for extradition," it is "nevertheless our duty . . . to ensure that the applicable provisions of the treaty and the governing

8

American statutes are complied with." *Id.* (brackets and quotation marks omitted). We therefore "review the factual findings of the District Court for clear error and its legal determinations *de novo*." *Id.*

## II. Analysis

This appeal centers on the meaning of the Treaty's Lapse of Time provision – specifically, whether the use of the word "may" in the first sentence of that provision is discretionary or mandatory in nature. The Lapse of Time provision appears in Article 6 of the Treaty and provides:

> Extradition *may* be denied under this Treaty when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State. The period during which a person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations. Acts or circumstances that would suspend the expiration of the statute of limitations of either State shall be given effect by the Requested State, and in this regard the Requesting State shall provide a written statement of the relevant provisions of its statute of limitations, which shall be conclusive.

S.A. at 46 (emphasis added). The question on appeal is who decides whether the statute of limitations of the Requested State – here, the United States – applies to

bar an extradition: the court, in making a mandatory determination before issuing a certificate of extraditability, or the Secretary of State, in making a discretionary decision in his capacity as part of the Executive Branch of the United States government.

Yoo argues that whether the applicable statute of limitations has run is a mandatory determination for the court – and not the Secretary of State – to make; that the untimeliness of those charges is a mandatory bar to his extradition; and that the magistrate judge therefore erred in issuing the Certificate. The government in turn argues that the application of the Treaty's Lapse of Time provision is a discretionary decision to be made by the Secretary of State when the United States is the Requested State, or by the relevant executive authority in South Korea when South Korea is the Requested State. Both parties draw on the federal courts' traditional role in extradition proceedings, the Treaty's text, and the Treaty's legislative history to support their arguments. After our review of the Treaty's text and legislative history, as well as the parties' arguments, we agree with the government and find that the district court did not err in denying Yoo's habeas petition.

10

**A.      The Court's Role in Extradition Proceedings**

Federal courts play an important role in extradition proceedings. The federal extradition statute, 18 U.S.C. § 3184, provides the legal framework for extradition proceedings, and that statute's "primary function" is to "interpose the judiciary between the executive and the individual." *Lo Duca v. United States*, 93 F.3d 1100, 1103 (2d Cir. 1996) (brackets and quotation marks omitted).  Under § 3184, "any justice or judge of the United States, or any magistrate judge authorized to do so by a court of the United States," may hear and consider the "evidence of criminality" presented by a complaint seeking the extradition of an individual within that court's jurisdiction to the country where those criminal acts were allegedly committed. 18 U.S.C. § 3184.

During an extradition hearing, the "judicial officer's inquiry is confined to . . . whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof." *Cheung*, 213 F.3d at 88. If, after a hearing, the court "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention" between the United States and the foreign state, 18 U.S.C. § 3184, the court shall "issue a

11

certificate of extraditability to the Secretary of State, who has final and discretionary authority to extradite the fugitive." *Skaftouros v. United States*, 667 F.3d 144, 154 (2d Cir. 2011). An extradition hearing is "'essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation.'" *Id.* at 155, quoting *Lo Duca*, 93 F.3d at 1104.

But unlike other court orders that are final decisions and appealable as of right under 28 U.S.C. § 1291, extradition orders are "regarded as preliminary determinations," and "may only be reviewed by a petition for a writ of habeas corpus under 28 U.S.C. § 2241." *Id.* at 157, citing *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976). That review is nevertheless limited. "Courts have consistently held that habeas corpus is available to an extraditee 'only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and . . . whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.'" *Id.*, quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Like other decisions on habeas corpus petitions, the district court's habeas ruling may be appealed by the losing party to the appropriate court of appeals. *See* 28 U.S.C. § 2253(a) (providing that in a habeas

12

corpus proceeding, "the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held").

In order to obtain habeas relief, the extraditee "must prove by a preponderance of the evidence that he is 'in custody in violation of the Constitution or laws or treaties of the United States,' which, in this context, will typically mean in violation of the federal extradition statute, 18 U.S.C. § 3184, or the applicable extradition treaty." *Skaftouros*, 667 F.3d at 158 (internal quotation omitted). It is the duty of the federal courts to "'ensure that the applicable provisions of the treaty and the governing American statutes are complied with.'" *Sacirbey*, 589 F.3d at 63, quoting *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 565 (2d Cir. 1963) (brackets omitted).

But the issuance of a certificate of extraditability and the denial of habeas relief are not the end of the story, as the courts are not the final arbiter in extradition cases. "If habeas relief is denied, the Secretary of State has sole discretion to weigh the political and other consequences of extradition and to determine finally whether to extradite the fugitive," *Cheung*, 213 F.3d at 88, citing 18 U.S.C. § 3186, because the "question of the wisdom of extradition remains for the executive branch to decide," *Murphy v. United States*, 199 F.3d 599, 602 (2d Cir.

13

1999) (citation and quotation marks omitted). The Secretary of State does not have a legal duty to extradite a fugitive and may ultimately refuse to do so, even if the district court issues a certificate of extraditability. *Lo Duca*, 93 F.3d at 1103-04. Owing to the Executive Branch's special role in handling the United States' foreign affairs, the Secretary of State may "reverse the judicial officer's certification of extraditability if she believes that it was made erroneously" but may also "decline to surrender the [fugitive] on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997).

### B.     The Text of the Treaty

Yoo argues that under the terms of the Treaty, the embezzlement charges he faces in South Korea are time-barred. Yoo focuses primarily on the meaning of the word "may" in the first sentence of the Lapse of Time provision in Article 6, which states that "[e]xtradition *may* be denied under this Treaty when the prosecution or execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State." S.A. at 46 (emphasis added). Yoo argues that even if the use of the word "may" usually implies discretion, that reading "should not be

14

controlling when other considerations point differently," as he argues they do in this case. Appellant's Br. 14-15. We disagree.

The interpretation of treaties is a familiar exercise in the federal courts: "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) (citation and quotation marks omitted). In interpreting both statutes and treaties, courts seek to "avoid readings that 'render statutory language surplusage' or 'redundant.'" *Sacirbey*, 589 F.3d at 66, quoting *Filler v. Hanvit Bank*, 378 F.3d 213, 220 (2d Cir. 2004). But where the "language of a treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Georges v. United Nations*, 834 F.3d 88, 92 (2d Cir. 2016) (brackets, quotation marks, and citation omitted).

In addition to the treaty's text, courts have also "considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *Medellin v. Texas*, 552 U.S. 491, 507 (2008), quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996). And while the matter of treaty interpretation is ultimately a question of law for the courts, "given the nature of the document and the unique relationships it

15

implicates, the Executive Branch's interpretation of a treaty is entitled to great weight." *Georges*, 834 F.3d at 93 (quotation marks and citation omitted).

We are not the first Court of Appeals to consider the meaning of the word "may" in Article 6 of the Treaty between the United States and South Korea. In *Patterson v. Wagner*, 785 F.3d 1277 (9th Cir. 2015), the Ninth Circuit reasoned that because the "normal reading of 'may' is permissive, not mandatory," the "most natural reading of Article 6 . . . is that untimeliness is a discretionary factor for the Secretary of State to consider in deciding whether to grant extradition." *Id.* at 1281. Under the Ninth Circuit's reading, "the Secretary 'may' decline to extradite someone whose prosecution would be time-barred in the United States, but he or she is not required to do so," and "there is no mandatory duty that a court may enforce." *Id.*

Another of our sister Circuits has similarly read the language of Article 6's Lapse of Time provision as discretionary in nature. The Sixth Circuit, sitting en banc, discussed the U.S.-Korea Treaty, as well as several other treaties with similar provisions to which the United States is a party, in interpreting the lapse of time provision in the extradition treaty between the United States and Mexico. *Martinez v. United States*, 828 F.3d 451, 460-61 (6th Cir. 2016). The court cited

Article 6 of the Treaty as an example of a provision that "*permits* the parties to deny extradition" in the relevant circumstances. *Id.* at 460 (emphasis added). The court contrasted the U.S.-Korea Treaty with the extradition treaty between the United States and France, noting that the latter "*forbids* extradition if prosecution is 'barred by *lapse of time*' in the requested State." *Id.* at 461 (citation omitted, first emphasis added, and second emphasis in original).

We agree with the conclusions of our sister Circuits in *Patterson* and *Martinez* that the most natural reading of the word "may" in Article 6 is permissive, not mandatory. The use of the word "may" – in contrast to words like "shall" or "must" – authorizes, rather than commands. *See N.Y. State Dep't of Env't Conservation v. Fed. Energy Regul. Comm'n*, 991 F.3d 439, 446 (2d Cir. 2021); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion."). On a plain reading of Article 6's text, we see no reason to disagree with the reading given to that provision by the Ninth and Sixth Circuits.

Yoo objects to the district court's reliance on *Patterson* and its ultimate determination that the "natural reading of the first sentence [of Article 6] is that it is permissive rather than mandatory." *See Yoo*, 2021 WL 5054726, at *5. Of course,

17

the use of the word "may" is not "necessarily conclusive of congressional intent to provide for a permissive or discretionary authority." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198 (2000). We have also acknowledged that "in some limited scenarios, the word 'may' can impose a mandatory directive," because "[a]lthough 'the word "may," when used in a statute, usually implies some degree of discretion, this common-sense principle of statutory construction is by no means invariable and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute.'" *In re Clinton Nurseries, Inc.*, 998 F.3d 56, 66 (2d Cir. 2021) (brackets omitted), quoting *United States v. Rodgers*, 461 U.S. 677, 706 (1983).

Yoo argues that a "careful reading of the Treaty demonstrates that the drafters did not use 'may' consistently to identify those issues that were for the Secretary of State to consider in the exercise of his discretion," Appellant's Br. 12. The Treaty does, of course, use the words "may" and "shall," along with related terms in multiple places and with multiple variations. For instance, as Yoo points out, Article 2(4) of the Treaty, which addresses situations in which the charged offense was committed outside of the Requesting State's territory, provides that "[i]f the laws in the Requested State do not" provide for "punishment of an

18

offense committed outside of its territory in similar circumstances" then the "executive authority of the Requested State *may, in its discretion*, grant extradition, provided that the requirements of this Treaty are met." S.A. at 44 (emphasis added). Yoo argues that if "'may' always means executive branch discretion, then the words 'executive authority' and 'in its discretion' would be surplusage" in Article 2(4), as "[t]he word 'may' would be enough." Appellant's Br. 12.

But Yoo's argument ignores the fact that the Treaty uses the word "may," standing alone, in several other provisions, including in Article 2(4) itself. For instance, Article 2(4) also states that "[e]xtradition *may* be refused when the offense for which extradition is sought is regarded under the law of the Requested State as having been committed in whole or in part in its territory and a prosecution in respect of that offense is pending in the Requested State." S.A. at 44 (emphasis added). As another example, Article 2(7) provides that "[w]here the request for extradition relates to a person sentenced to deprivation of liberty by a court of the Requesting State for any extraditable offense, extradition *may* be denied if a period of less than four months remains to be served." *Id.* at 45 (emphasis added). Similarly, Article 4(4) provides that "[t]he executive authority of the Requested State *may* refuse extradition for offenses under military law

19

which are not offenses under ordinary criminal law." *Id.* at 46 (emphasis added). And Article 7(1) provides that "[w]hen the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the Requested State *may* refuse extradition" unless certain conditions are met. *Id.* at 47 (emphasis added). Yoo himself concedes that the use of the word "may" in Article 7(1) "implies a degree of discretion," Appellant's Br. 13, though he maintains that the use of the word "may" in Article 6 does not.

The Treaty also uses the word "shall" in several places. For example, Article 4(1) provides: "Extradition *shall* not be granted if the Requested State determines that the offense for which extradition is requested is a political offense." S.A. at 45 (emphasis added). And Article 5 provides: "Extradition *shall* not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested." *Id.* at 46 (emphasis added).

The Treaty's uses of both "may" and "shall" demonstrate that its drafters were well aware of the difference between permissive and mandatory determinations and how to provide for each of them when drafting the Treaty's

20

text. Moreover, the Treaty uses the word "shall" in Articles 4 and 5, the Articles immediately preceding Article 6, to delineate instances in which extradition "shall not be granted" – that is, where the relevant offense is a political offense or where the person sought has already been convicted or acquitted of the relevant offense in the Requested State – but then uses the word "may" in the very next Article to describe when extradition is available for offenses whose prosecution would have been barred by the Requested State's statute of limitations had the offense been committed within that State's jurisdiction. The mandatory refusals in Articles 4 and 5 sharply contrast with the permissive nature of Article 6, and it is difficult to escape the implication that the shift from using "*shall* not be granted" to "*may* be denied" in back-to-back Articles was deliberate.

The Supreme Court has "caution[ed] against ignoring contexts in which 'Congress' use of the permissive "may" contrasts with the legislators' use of a mandatory "shall" in the very same section,' and where 'elsewhere in the same statute, Congress use[s] "shall" to impose discretionless obligations.'" *Clinton Nurseries, Inc.*, 998 F.3d at 66 (brackets omitted), quoting *Lopez v. Davis*, 531 U.S. 230, 241 (2001). The Treaty does indeed use the words "may" and "shall," or similar phrases, within the same provision. For example, Article 2(4), which, as

21

we previously noted, uses both "may" and the formulation "may, in its discretion," also provides that "[i]f the offense was committed outside the territory of the Requesting State, extradition *shall* be granted in accordance with this Treaty" under certain circumstances. S.A. at 44 (emphasis added). And Article 3(1) provides: "Neither Contracting State *shall* be bound to extradite its own nationals, but the Requested State shall have the power to extradite such person if, *in its discretion*, it be deemed proper to do so." *Id.* at 45 (emphasis added).[2]

Both of those provisions – as well as others throughout the Treaty – demonstrate that the Treaty's drafters knew the difference between a mandatory determination and a discretionary consideration and drafted the Treaty's provisions accordingly. The fact that the Treaty's drafters sometimes used additional, perhaps superfluous, phrases like "in its discretion" in other

---

[2] Yoo argues with regard to Article 3(1) that if "'shall' always means that an issue is mandatory, then the words 'in its discretion' would be contradictory." Appellant's Br. 13. But in the context of this provision, the second "shall" in the sentence "Neither Contracting State shall be bound to extradite its own nationals, but the Requested State *shall* have the power to extradite such person if, in its discretion, it be deemed proper to do so," is plainly not used to imply any kind of mandatory meaning or directive. Rather, it simply provides that the Requested State has the (absolute) power to extradite its own national if, in the Requested State's discretion, it "be deemed proper to do so."

22

provisions of the Treaty does not mean that the word "may," standing alone, lacks its customary meaning of being permissive or providing for discretion, absent compelling evidence to the contrary. As the Supreme Court has instructed, in some situations it is "appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007).

We think this is just such a situation. We conclude that the word "may" has it customary meaning when used in Article 6 and that it is, based on the plain text, permissive or discretionary in nature. There is nothing in the Treaty's text that indicates that the word "may" has any meaning other than its customary one.

## C.    Legislative History

In addition to his textual argument, Yoo points to the Treaty's legislative history to argue that it "compels the conclusion that untimeliness bars extradition – *i.e.*, that it is a mandatory bar – and therefore the issue is for the court." Appellant's Br. 16. Yoo focuses on three pieces of legislative history: the Senate Report's introductory summary of the Treaty's "Key Provisions," prepared by the Senate Committee on Foreign Relations and submitted to the Senate in its

consideration of the Treaty; the Technical Analysis to that same Senate Report, prepared by the U.S. treaty negotiators; and a colloquy between a United States senator and the then-Acting Director of the Office of International Affairs during the Congressional hearing on the Treaty. But on closer examination, none of these compels us to revisit our conclusion that Article 6 is discretionary in nature. In fact, the most reliable piece of legislative history – the Senate Report's Technical Analysis of Article 6 – actually confirms that conclusion.

Yoo first points to the Senate Report's summary of the Treaty's "Key Provisions." The section of the summary dealing with Article 6's Lapse of Time provision reads in its entirety as follows:

> The Treaty with the Republic of Korea precludes extradition of offenses barred by an applicable statute of limitations. However, time during which a fugitive has fled prosecution is not to be counted toward the applicable limitation period, or is any other time that would suspend the limitation period under the law of either the Requesting or Requested State.

S. Rep. No. 106-13 at 5 (1999); S.A. at 73. Yoo argues that "[a] summary section is intended to convey the gist of a provision, and the gist here is that Article 6 is mandatory," because the summary's use of the word "precludes" "does not allow for discretion." Appellant's Br. 16. Other sections of the summary, such as

24

the summary of the "Death Penalty Exception," use words like "permits," S. Rep.

No. 106-13 at 4; S.A. at 72, rather than the word "precludes," a difference that

does support Yoo's argument. But the use of one word in a summary section of a

Senate Report cannot hold the weight Yoo wishes to place on it, especially when

it is directly contradicted by not only the Treaty's enacted language, but also that

same Senate Report's more detailed treatment of Article 6 in its Technical

Analysis section.

In relevant part, that Technical Analysis, which was prepared by the U.S.

treaty negotiators for the Senate Committee on Foreign Relations, *see* S.A. at 74,

reads as follows:

> Article 6 states that extradition may be denied
> when the prosecution would have been barred by lapse
> of time according to the law of the Requested State had
> the same offense been committed in the Requested State.
> Similar provisions are found in recent U.S. extradition
> treaties with Japan, France, and Luxembourg.
>
> Korea insisted on this provision because Korean
> law demands that extradition be denied if the statute of
> limitations would have expired in either Korea or in the
> Requesting State. However, the delegations were
> sensitive to the fact that U.S. and Korean statutes of
> limitations are so different that this provision could be
> very difficult to implement.

S. Rep. No. 106-13 at 14; S.A. at 82 (footnotes omitted). Contrary to Yoo's assertions, the Technical Analysis actually confirms our plain reading. That section's very first line provides: "Article 6 states that extradition *may be denied* when the prosecution would have been barred by lapse of time . . ." *Id.* (emphasis added). That first line both matches the Treaty's enacted language and contradicts the Senate Report's summary section, suggesting that the use of the word "precludes" in that section was an error. Thus, as the Ninth Circuit noted in *Patterson*,"[t]he more detailed technical analysis of the treaty . . . describes Article 6 in permissive terms." 785 F.3d at 1282.

But Yoo ignores that first line of the Technical Analysis. Instead, he focuses on the section's use of the words "insisted" and "demands," in describing South Korea's priorities in negotiating the Treaty, arguing that those words "bespeak lack of discretion." Appellant's Br. 17. He further asserts that "[i]f a country demands that extradition be denied under certain circumstances, it is not leaving the issue open to debate or negotiation." *Id.*

But the Technical Analysis's account of the Treaty's negotiation does not indicate that Article 6 itself is mandatory in nature. The fact that South Korea "insisted" on the Lapse of Time provision because of the specific "demands" of

26

the Korean statute of limitations means only that South Korea, when acting as the Requested State, wanted the ability to deny extradition if the statute of limitations for the relevant offense had lapsed under Korean law. The fact that South Korea demanded a certain provision with the intent to apply its own statutes of limitations in most circumstances – or even in every circumstance – does not mean that the parties lack all discretion. Rather, South Korea simply insisted that the Treaty would provide it with the power to exercise its discretion to apply its own statutes of limitations. Neither the fact that the Treaty grants that power to both countries nor the putative intention of South Korea to exercise that power in most or all cases is inconsistent with the clear statement in the Treaty's language that the United States retains discretion to decide whether to extradite on that basis – discretion that, under United States law, is exercised by the Secretary of State.

Further, the Technical Analysis itself cites to three other extradition treaties – ones the United States negotiated around the same time it negotiated the Treaty with South Korea – as examples of treaties with "[s]imilar provisions." S.A. at 82. As the Ninth Circuit points out, "two of those treaties use the word 'shall,' and one uses the word 'may.'" *Patterson*, 785 F.3d at 1282. The Technical Analysis's

citations to these other treaties demonstrate that the United States was well aware of the different configurations of language it could use in a given treaty's provisions to achieve different outcomes. In other words, as the Ninth Circuit observed in *Patterson*, "[w]hen parties to a treaty intend to make an exception to extradition mandatory . . . they know how to state that it 'shall' apply." *Id.* Here, based on the plain language of the Treaty and the Technical Analysis, the parties intended to make the statute of limitations exception to extradition permissive, and knew how to state that it "may" apply.

Yoo's third piece of legislative history is a colloquy between U.S. Senator Rod Grams of Minnesota and John Harris, then the Acting Director of the Office of International Affairs in the Department of Justice's Criminal Division, that took place during the Congressional hearing on the Treaty. That colloquy went as follows:

> SENATOR GRAMS: Article 6 of the proposed treaty bars extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out.
> Now South Korea, unlike other treaty partners with similar commitments, also allows the time to continue running on the time limitation, even when charges are filed. Actions that would toll the statute of limitations, therefore, will apply under this treaty.

28

So the question is are you confident that this article of the treaty adequately insures that fugitives cannot simply run out the clock by fleeing to Korea?

MR. HARRIS: Senator, this article of the treaty was the subject of considerable negotiation. As you may recall, of the treaties that were before the Senate last fall, most of them had slightly different language. Many of our most modern extradition treaties flatly state that the statute of limitations of the requesting State will apply.

We have a few in which it was not possible to reach that resolution. In this case, because of the specific provisions of Korean law, we did agree that the statute of limitations of the requested State would apply. But, as you have indicated, the specific language in the article is crafted so that those factors which toll the statute of limitations under the law of the requesting State would be given weight.

So when the United States is making a request to Korea, there should be the ability to prevent a miscarriage of justice by the statute of limitations of Korea having expired before extradition can be accomplished.

S.A. at 104.

Yoo argues that Senator Grams "[p]lainly . . . believed that Article 6 was a mandatory provision" and that because Mr. Harris "said nothing, either directly or by implication, to contradict Senator Grams' statement that if the statute of limitations has expired, . . . 'the proposed treaty *bars* extradition.'" Appellant's Br. 20 (emphasis in original). In Yoo's view, if Senator Grams's understanding was

incorrect and Article 6 was actually a permissive factor for the Secretary of State to consider in his or her discretion, Mr. Harris would have corrected him.

Like the Senate Report summary, the colloquy between Senator Grams and Mr. Harris cannot bear the weight Yoo wants it to. We agree with the Ninth Circuit in *Patterson* that the colloquy "only weakly supports [the] contention that the Senate understood the provision to be mandatory." 785 F.3d at 1282. We also agree with the district court that because the focus of the colloquy was on a scenario in which the *United States* requested extradition from *South Korea*, rather than the other way around, as it is in Yoo's case, the colloquy is "not particularly helpful in answering the question here." *Yoo*, 2021 WL 5054726, at *8. In any case, one senator's misunderstanding of a treaty provision is not conclusive as to the understanding of the Senate as a whole or binding on us as a federal court.

After considering the legislative history, only two pieces cited by Yoo counsel weakly in his favor. The more reliable evidence – the Senate Report's Technical Analysis – actually points the other way. We credit that evidence in reaching our conclusion that whether Article 6 applies is a discretionary determination to be made by the Secretary of State.

30

**D. Other Considerations**

In addition to the legislative history, we consider the executive branch's own interpretation of the Treaty. Here, the evidence of that interpretation further confirms our interpretation of the plain language of Article 6. "We place great weight on the interpretation of a treaty by the Executive of our federal government." *Mora v. New York*, 524 F.3d 183, 204 (2d Cir. 2008) (quotation marks and citations omitted); *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

With one minor exception highlighted by Yoo, it appears that the United States government's position on the permissive nature of Article 6 has been consistent. In presenting the Treaty it had negotiated to the President, the State Department made clear in its submittal letter that "Article 6 *permits* extradition to be denied when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State." S. Treaty Doc. No. 106-2 (emphasis added). And, as we noted

31

above, in presenting the Treaty to the United States Senate, those responsible for negotiating the Treaty made clear in the Technical Analysis that Article 6 was discretionary, and not mandatory, in nature. We find that the government's own consistent interpretation of the Treaty is entitled to great weight.

Moreover, "[w]hen the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo Shoji Am.*, 457 U.S. at 185. The government represented before the district court that the South Korean government shares its position that the word "'may' means 'may,' not 'must,'" in Article 6. *Yoo*, 2021 WL 5054726, at *9 n.7. Absent evidence to the contrary, we see no reason not to defer to the parties' interpretation of their Treaty.

Yoo cites one prior extradition proceeding involving South Korea to argue that the government's position regarding Article 6 has not been consistent. In *Man-Seok Choe v. Torres*, 525 F.3d 733 (9th Cir. 2008), South Korea sought extradition of a Korean citizen living in California to face corruption charges. *Id.* at 736. There, the government did not present the extradition court with the position it has taken throughout this litigation, namely that the federal courts do

not have the authority to deny extradition based on Article 6 of the Treaty because that provision uses discretionary language and only the Secretary of State may make that determination in his or her discretion. Instead, the government did not raise that argument until oral argument on appeal before the Ninth Circuit. *Id.* at 740 n.9. The Ninth Circuit deemed this argument "waived" because it was raised for the first time only on appeal. *Id.*

Yoo relies on the Ninth Circuit's waiver finding in *Choe* to argue that if "may" really has the meaning the government argued it did during oral argument before the Ninth Circuit, the government would have taken that position from the beginning of the *Choe* litigation. The government represents that it has maintained the position it presents here in other similar extradition cases involving the Treaty. The government also argues that "a single inadvertent waiver by a different United States Attorney's Office should not detract from the deference owed to the Government's position." Appellee's Br. 17-18 n.3. We agree with the government. The fact that one United States Attorney's Office simply failed to raise an argument – as opposed to affirmatively taking the opposite position – and thereby forfeited it before one of our sister circuits does not hold much weight when compared to the government's otherwise consistent

position, particularly where the government did in that very case eventually adopt the same position that it has otherwise consistently advocated.

Yoo finally argues that because statutes of limitations provide certain protections for those accused of crimes, leaving it to the Secretary of State to decide in his discretion whether the statute of limitations bars an extradition would "dilute[]" those protections and would be "dangerous to liberty." Appellant's Br. 22-23. We agree with Yoo that statutes of limitations serve important purposes. But none of those purposes offer powerful reasons for us to interpret the Treaty in the way Yoo argues we should, given that the language of the Treaty and the government's intent in negotiating and signing the Treaty clearly points the other way.

Moreover, while the *concept* of a limitations provision requiring criminal cases to be brought within a specified period serves important purposes, the *specific* statute of limitations chosen by a jurisdiction for a given offense necessarily represents a somewhat arbitrary exercise in line-drawing. And the very arbitrariness of any given statute of limitations for any given crime makes the issue well-suited to discretionary determinations such as those provided for by Article 6. Indeed, there are any number of reasons why a country entering an

extradition treaty might want to retain discretion in deciding whether to extradite, even if its own statute of limitations would be violated had the crime been committed within its jurisdiction. For example, consider a hypothetical financial crimes offense, similar to those Yoo faces, which has a six-year statute of limitations in the Requesting State but only a five-year statute of limitations in the Requested State. Suppose that the Requesting State indicted the offender five years and a month after the offense was committed, and only later located the offender, now a fugitive, in the Requested State. Even though the offender could not be prosecuted in the Requested State for the same offense had it happened there, he could still be prosecuted in the Requesting State. An extradition under those circumstances would hardly be outrageous given that the Requesting State's delay in bringing charges was still within its own statute of limitations. But suppose the Requesting State has recently extended the statute of limitations to thirty years, in order to permit prosecuting a specific offender for a twenty-five-year-old financial crime. In that situation, the Requested State may reasonably hesitate to extradite, particularly in light of its own, much shorter statute of limitations and the nature of the offense. There is nothing absurd about a country's reserving discretion to consider whether applying its own statute of

limitations would, in a given case, be overly protective or necessary to avoid injustice, rather than setting an invariant rule binding its courts to deny extradition.[3]

At bottom, bilateral treaties are the result of negotiations between the signatory parties. As the Sixth Circuit's survey of different extradition treaties in *Martinez* demonstrates, 828 F.3d at 460-61, different countries may well have different priorities when it comes to enforcing their own statutes of limitations. Moreover, as that survey demonstrates, the United States itself does not seem to have an inflexible position on the statute of limitations issue, as it has negotiated treaties with both mandatory and permissive provisions. That variety is instead likely the result of different priorities among the United States's treaty partners. The fact that there is no consistent approach to the statute of limitations issue among extradition treaties demonstrates that the permissive nature of this

[3] We do not suggest that our analysis of possible rationales supporting a country's decision to enter a treaty with a discretionary Lapse of Time provision is a reason, independent of the Treaty's text, to interpret the Treaty to provide for such discretion. Rather, we consider these possible rationales only to assess Yoo's argument that a discretionary provision would be so "dangerous to liberty" that it could not have been the intention of the Treaty's drafters to include one. For the reasons stated, that argument, in addition to being inconsistent with the Treaty's text, fails on its own terms.

Treaty's Lapse of Time provision is not a deviation from a norm. Rather, it is simply a variation derived from the negotiations between the United States and South Korea.

### E. Summary

Based on the customary meaning of the word "may" and its particular use in Article 6 of the Treaty; the Senate Report's Technical Analysis, the most authoritative item of legislative history cited by either party to this case; and the government's consistent position as to the meaning of the provision, we hold that the plain meaning of the word "may" in that provision is discretionary, and not mandatory, in nature. We further hold that because Article 6's Lapse of Time provision is discretionary, the decision whether to deny extradition on the basis that the Requested State's relevant statute of limitations would have barred prosecution had the relevant offense been committed within that State's jurisdiction is a decision consigned to that State's relevant executive authority, and is not a mandatory determination to be made by a federal court before issuing a certificate of extraditability. For Yoo, that means that the United States Secretary of State has the authority to determine whether the relevant statute of limitations would bar Yoo's prosecution had the charged offenses been

committed in the United States and, if so, whether to deny extradition on that basis.[4] For these reasons, the district court did not err in denying Yoo's petition for writ of habeas corpus.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[4] Because the effect of the Lapse of Time provision of the Treaty is a question to be addressed by the Secretary of State in his discretion, we have no occasion to comment on the merits of the parties' conflicting arguments as to whether prosecution in the United States would be barred by any applicable statute of limitations.